Argued June 29, reversed November 9, 1920.

## BOOTH–KELLY LUMBER CO. *v*. OREGON & CALIFORNIA R. CO.

### (193 Pac. 463.)

**Public Lands—Railroad Liable for Price Per Acre Paid to United States to Perfect Title—"Void."**

1. In view of the Chamberlain-Ferris Act of June 9, 1916, a lumber company, which in good faith purchased some 19,000 acres of land from a railroad company, in violation of the grant of the land to the road from the United States, providing that it should be sold only to actual settlers in quantities not greater than quarter-sections, and for not more than $2.50 an acre, *held* entitled to recover from the railroad, whose title was defeated by the United States, the amount of $2.50 an acre paid by it to the United States to perfect its title, but not the total illegal price paid by it to the road, the contract between it and the road not having been "void"; that is, a mere nullity.

For the meaning of the word "void," see note in 5 A. L. R. 1518.

From Multnomah:

JOHN P. KAVANAUGH,
GEORGE W. STAPLETON and } Judges Sitting in Banc.
ROBERT TUCKER,

This is an action to recover money paid by plaintiff to defendant for land which by statute defendant was prohibited from selling. A demurrer to the complaint was sustained, and, the plaintiff declining to amend or plead further, judgment that plaintiff take nothing by its action was entered. Plaintiff appeals. Error is assigned in sustaining the demurrer and entering the judgment.

The complaint contains substantially the following allegations: By two instruments in writing, dated December 21, 1901, and January 2, 1903, respectively, the defendant agreed to sell and convey, and the plaintiff's assignor agreed to purchase, 19,283.71 acres of land at $10 per acre, the defendant agreeing that when the purchase money was paid, it would "cause to be made and executed * * a deed, assigning, transferring and setting over * * all the land" therein described. The purchase money was paid to the defendant, and all was done by the plaintiff and its assignors as agreed, but the defendant never performed its stipulations, and refuses to do so. The land described in the written instruments was a part of a grant, of over two million acres by the United States to the defendant, by an act of Congress of July 25, 1866 (14 Stat. 239) as amended April 10, 1869 (16 Stat. 47). The act of Congress of April 10, 1869, required the defendant to sell the land "to actual settlers only, in quantities not greater than one-quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre."

Prior to the date of the transaction between the parties hereto, patents were issued by the United States to the defendant for the land described in the instruments mentioned and over two million acres besides. These patents contained nothing to indicate that any such statutory prohibition existed, and did not mention the act of 1869 in which it was contained. Beginning many years prior to the date of the written instruments, the defendant had made a large number of sales of land granted by the acts of Congress, to purchasers who were not actual settlers, in quantities much greater than one-quarter section to one purchaser, and for prices greatly exceeding $2.50 per acre. This was a matter of general knowledge in the vicinity of these lands, where the title of the defendant to its granted lands was generally regarded as a perfect title in fee simple, without encumbrance or restriction, and customarily accepted as such, without question or examination. The plaintiff and its assignors knew and relied upon these facts, and had no knowledge of the statute prohibiting the defendant from making such a sale. The defendant knew of that statute, knew that the plaintiff and its assignors had no knowledge thereof, and knew that they relied upon the facts, knowledge, and custom above mentioned. The defendant represented to the plaintiff and its assignors that it was the owner of an unencumbered and unrestricted fee-simple estate in the lands described in the instruments. The plaintiff and its assignors relied thereon, and understood that such an estate in the land was to be conveyed to them. This and other like transactions of the defendant, violative of the requirements of the provisos of the granting act as to the sale of the land, came to the attention of the United States. By subsequent legis-

lation and judicial proceedings, the United States took from defendant, not only this land which defendant had undertaken to convey to plaintiff, but all the rest of the two million acres of land granted to it, and provided, for the payment, by the United States to the defendant, of $2.50 an acre for the entire land grant, including the land which was the subject of the present transaction. Such forfeiture of the grant has been upheld by the Supreme Court of the United States.

It is deemed essential that reference be made to the acts of Congress concerning this land grant and the judicial decisions interpreting the grant and determining the rights of the defendant. The land which defendant undertook to sell to plaintiff is part of over two million acres granted to defendant, known as the "East Side Grant." This granting act, as amended, provided:

"That the lands granted * * shall be sold to actual settlers only, in quantities not greater than one-quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre."

The "West Side Grant" of May 4, 1870, contained a like provision, both known as the "settler's clause." The defendant in its dealings with the lands granted to it by these acts had for a long time entirely disregarded these provisos. On May 28, 1908, pursuant to an act of Congress of April 30, 1908 (35 Stat. 571), authorizing and directing him to proceed to enforce any rights or remedies of the United States growing out of the above-mentioned acts of Congress, the Attorney General of the United States filed a bill in equity against the defendant and others, and in January, 1909, forty-five other bills in equity, the railroad company being a party defendant in each

of them. In each of these cases there was joined as an additional party defendant some individual or corporation to whom the defendant had attempted to sell some of the land in violation of the prohibition contained in the granting acts, the plaintiff being such an additional defendant in one of those suits. The suit of May 28, 1908, called for convenience the "main case," involved the title to granted land which the defendant had not in any way attempted to sell, and each of the forty-five later suits, known as the "Innocent Purchaser Cases," concerned only the land which the defendant had attempted to sell to such an additional party defendant. The United States in all these suits asserted that by reason of breaches by the defendant of the so-called "settler's clause" in the grants, the title had been forfeited to and revested in the United States. This contention of the government was sustained by Judge WOLVERTON in a decision of April 24, 1911, in the main case (*United States* v. *Oregon & California R. Co. et al.* (C. C.), [186 Fed. 861]).

The act of Congress of August 20, 1912, authorized the Attorney General to enter into a compromise with any purchaser of the granted lands against whom suit had been brought under the joint resolution of April 30, 1908, and it was provided that such compromise should require the entry of a decree of forfeiture against such purchaser, and that within six months of the entry of such decree the purchaser should be entitled, on payment of the sum of $2.50 per acre to the United States, to receive a patent for the lands covered by such decree. Pursuant to section 4 of this act, the Attorney General stipulated with the plaintiff, the additional party defendant in one of the forty-five suits above mentioned, and a

decree of forfeiture was entered in that case. The defendant, a party to that suit, was present and offered no objection to the entry of that decree. All this was done in February and March, 1913. Thereafter plaintiff made application to the Secretary of the Interior to purchase the lands forfeited, paid the Treasurer of the United States $2.50 per acre for all the lands so applied for, and on July 21, 1913, the Secretary of the Interior caused a patent to be issued to plaintiff, conveying the land to it. The main case, involving the rights of the defendant in the entire grant, was decided by the Supreme Court of the United States on June 21, 1915 (*Oregon & California R. Co.* v. *United States,* 238 U. S. 393 [59 L. Ed. 1360, 35 Sup. Ct. Rep. 908, see, also, Rose's U. S. Notes]), about two years later. The Supreme Court held that the only interest the defendant ever had in this land was the right to receive not more than $2.50 an acre for it by selling it to actual settlers only in tracts of a quarter-section or less; that under the terms of the grant, a law as well as a grant, it was unlawful for the defendant to sell in violation of its provisions; and that the United States might sell the lands, provided only it secured to the defendant all that the granting acts conferred upon it, namely, $2.50 per acre. Thereafter Congress, acting on this suggestion, enacted what is known as the "Chamberlain-Ferris Act," of June 9, 1916 (39 Stat. 218), providing for the sale of the land by the United States and the payment from the proceeds to the defendant of an amount equal to $2.50 an acre for the entire land grant. Section 7 of this act reads:

"That the Attorney-General of the United States be, and he is hereby authorized and directed to institute and prosecute any and all suits in equity and actions at law against the Oregon and California

Railroad Company, and any other proper party which he may deem appropriate, to have determined the amount of moneys which have been received by the said railroad company or its predecessors from or on account of any of said granted lands, whether sold or unsold, patented or unpatented, and which should be charged against it as a part of the 'full value' secured to the grantees under said granting Acts as heretofore interpreted by the Supreme Court. In making this determination the court shall take into consideration and give due and proper legal effect to all receipts of money from sales of land or timber, forfeited contracts, rent, timber depredations, and interest on contracts, or from any other source relating to said lands; also to the value of timber taken from said lands and used by said grantees or their successor or successors. In making this determination in the aforementioned suit or suits the court shall also determine, on the application of the Attorney General, the amount of the taxes on said lands ·paid by the United States, as provided in this Act, and which should in law have been paid by the said Oregon and California Railroad Company, and the amount thus determined shall be treated as money received by said railroad company.''

The validity of this act of June 9, 1916, has been sustained by the Supreme Court in an opinion of April 23, 1917 (*Oregon & California R. Co.* v. *United States,* 243 U. S. 549 [61 L. Ed. 890, 37 Sup. Ct. Rep. 443]). By this act it was provided that all claims of forfeiture asserted by the Attorney General in suits brought by him under the authority of the Fulton resolution of April 30, 1908, were declared to be of the same force and effect as declarations of forfeiture by Congress. It was provided that no suit should be instituted by the United States pursuant to the Fulton resolution of 1908, involving any land sold by the Oregon and California Railroad Company

prior to the date of that resolution, unless within one year from August 20, 1912, the date of the approval of the act. The purpose of this provision was to affirm the exclusion from suits against purchasers those who had purchased, contrary to the terms of the provisos, in quantities less than 1,000 acres. Compromises were made by the United States Attorney General with all other purchasers who were defendants in suits brought under the Fulton resolution. As stated in the opinion, *Oregon & California R. Co.* v. *United States,* 238 U. S. 393 (59 L. Ed. 1360, 35 Sup. Ct. Rep. 908):

"During the year 1870 the Oregon & California Railroad Company procured, by mortgage bonds, approximately $8,000,000, and during the year 1871 the West Side Company in the same way procured about $1,000,000. With the funds thus procured the lines of railroad contemplated by the act of 1866 and the act of May 4, 1870, respectively, were prosecuted continuously until about January, 1873."

REVERSED.

For appellant there was a brief over the names of *Mr. Glenn E. Husted* and *Mr. Mark Norris,* with an oral argument by *Mr. Husted.*

For respondent there was a brief over the names of *Mr. Alfred A. Hampson* and *Mr. Ben C. Dey,* with an oral argument by *Mr. Hampson.*

*Mr. S. W. Williams,* Special Assistant to U. S. Attorney General, *Amicus Curiae,* on brief in behalf of United States.

*Mr. George M. Brown,* Attorney General, and *Mr. J. O. Bailey,* Assistant Attorney General, as *Amici Curiae,* on brief in behalf of State of Oregon.

BEAN, J.—1. Having rendered an opinion on this date in the case of *Hammond* v. *Oregon & California R. Co., ante,* p. 1 (193 Pac. 457), involving questions similar to those in the present case, but one phase of the case remains to be considered. It is the position of plaintiff that what the defendant undertook to do by its contract was prohibited by statute and null and void; that the plaintiff received nothing from defendant for the money it paid to it upon the land contract; that the transaction was not *malum in se,* but merely *malum prohibitum;* and that plaintiff is entitled to recover all the money it paid to defendant in this action for money had and received. It is suggested by plaintiff that in any event the plaintiff is entitled to recover the lesser sum of $2.50 per acre, the amount paid to the United States to perfect plaintiff's title.

There can be no question but that plaintiff, by its contract and payment, obtained all the right and title to the lands that the defendant had or could convey. What title did the defendant get by virtue of the grant and the construction of the road in compliance therewith? This question has been answered by the federal supreme court in *Oregon and California R. Co.* v. *United States,* 238 U. S. 393 (59 L. Ed. 1360, 35 Sup. Ct. Rep. 908). We quote from page 434 of 238 U. S., page 924 of 35 Sup. Ct. Rep. (59 L. Ed. 1360), the language used in construing the grants:

"There was a complete and absolute grant to the railroad company with power to sell, limited only as prescribed. * * "

The lumber company, after ascertaining all of the facts, did not attempt to rescind, or treat the contract as a nullity, but held fast to whatever rights they had. It was the vendee of all the interest the rail-

road had in the land and could convey, and as such vendee it established its good faith in the transaction to the satisfaction of the Department of Justice of the United States. By virtue of being such vendee, or innocent purchaser, it obtained a confirmation of its title to the lands upon the payment of $2.50 per acre to the United States. Being such purchaser from the railroad company formed the basis of its right to obtain a confirmatory title to the lands from the United States. This status was reached by means of its contract with, and payment to, the defendant. It is now contrary to plaintiff's former conduct for it to say that it received nothing by virtue of its contract, or the money paid defendant. It should not now be permitted to treat the foundation of its title as a nullity. As noted in the Hammond case, the title of plaintiff to the land was confirmed by the United States, and the contract in question ratified. The law applicable to the transaction and the policy of the government are both fixed by the federal acts and adjudication. In order to perfect its title to the lands plaintiff was compelled to, and did pay the sum of $2.50 per acre. As already stated in the Hammond case, the contract of purchase should be carried out as made by the parties or disregarded. It is not the province of the court to make a new contract for the parties. The plaintiff should have title to the lands for the price fixed by the contract, and should recover the amount it was compelled to pay for the outstanding title. This amount is not claimed by defendant to be unreasonable or unfair.

It is suggested by the defendant that it may be required to account and pay to the United States the full amount of the contract price. As we understand the provision in regard to the accounting, it is to

be adjudged in a legal manner. In the language of the Chamberlain-Ferris Act of June 9, 1916, suits are authorized—

"to have determined the amount of moneys which have been received by the said railroad company or its predecessors from or on account of any of said granted lands, whether. sold or unsold, patented or unpatented, and *which should be charged against it* as a part of the 'full value' secured to the grantees under said granting Acts as heretofore interpreted by the Supreme Court. In making this determination the court shall take into consideration and give due and proper legal effect to all receipts of money from sales of land or timber.* * " Section 7.

We see no reason for the defendant to fear that anything will be charged against it in such an accounting which should not be charged.

Confusion has resulted from the lack of precision in the use of the terms "void" and "voidable" contracts. A contract which the law denounces as void is necessarily no contract whatever, and the acts of the parties in an effort to create one in no wise bring about a change of their legal status. The parties and the subject matter of the contract remain just as they did before any act was performed in relation thereto. A void contract is a mere nullity. It is obligatory on neither party. It requires no disaffirmance to avoid it, and cannot be validated by ratification. It is void as to everybody whose rights would be affected by it if valid: 6 R. C. L., p. 591, § 10; *Bradtfelt* v. *Cooke,* 27 Or. 194 (40 Pac. 1, 50 Am. St. Rep. 701) ; *Allen* v. *Berryhill,* 27 Iowa, 534 (1 Am. Rep. 309) ; *Blinn* v. *Schwartz,* 177 N. Y. 252 (69 N. E. 542, 101 Am. St. Rep. 806) ; *Tate* v. *Gaines,* 25 Okl. 141 (105 Pac. 193, 26 L. R. A. (N. S.) 106) ;

*Jordan* v. *Greensboro Furnace Co.,* 126 N. C. 143 (35 S. E. 247, 78 Am. St. Rep. 644); *Kellogg* v. *Howes,* 81 Cal. 170 (22 Pac. 509, 6 L. R. A. 588, and note); *Austin* v. *Davis,* 128 Ind. 472 (26 N. E. 890, 25 Am. St. Rep. 456, 12 L. R. A. 120); *Breckenridge* v. *Ormsby,* 1 J. J. Marsh. (24 Ky.) 236 (19 Am. Dec. 71); *McFarland* v. *Heim,* 127 Mo. 327 (29 S. W. 1030, 48 Am. St. Rep. 629).

The land contract in question does not come within any of the descriptions of a void contract. It affected the rights of the parties and bore fruit. It is obligatory upon the defendant. The Booth-Kelly Lumber Company was not in equal fault with the Oregon and California Railroad Company in making the contract of sale in violation of the provisos of the grant, and is therefore entitled to recover the money paid to perfect its title. Upon this point, in addition to the other authorities cited in the Hammond and Winton case, see *Lowell* v. *Boston & Lowell R.,* 23 Pick. (Mass.) 24 (34 Am. Dec. 33, 37); *Tracy* v. *Talmage,* 14 N. Y. 162 (67 Am. Dec. 132, 143); *Schermerhorn* v. *Talman,* 14 N. Y. 93; *Bond* v. *Montgomery,* 56 Ark. 563, 571 (20 S. W. 525, 35 Am. St. Rep. 119); *Michener* v. *Watts,* 176 Ind. 376 (96 N. E. 127, 36 L. R. A. (N. S.) 142); *Manchester etc. R. Co.* v. *Concord R. Co.,* 66 N. H. 100 (20 Atl. 383, 49 Am. St. Rep. 582, 9 L. R. A. 689); *Quirk* v. *Thomas,* 6 Mich. 111.

The facts alleged in the complaint show that the plaintiff is entitled to recover the sum of $2.50 per acre, paid to the United States to perfect its title to the lands purchased of defendant. Therefore the demurrer to the complaint should be overruled.

The judgment of the lower court is reversed, and the cause will be remanded for such further proceed-

ings as may be deemed proper, not inconsistent here-
with.                                    REVERSED AND REMANDED.

Mr. Justice HARRIS did not sit in this case.

Mr. Justice BENNETT, who heard the case, having re-
signed, did not participate in the decision.

McBRIDE, C. J., and JOHNS, J., concur.

BURNETT, J., Dissenting in Part and Concurring in
Part.—The plaintiff sues to recover money which it and
its grantors paid to the defendant on a contract by
which the latter agreed to sell to the plaintiff certain
lands granted to predecessors in interest of the defend-
ant by the United States to aid in the construction of
certain railroads in this state.   The acts of Congress
granting the lands are those of July 25, 1866, 14 Stat.
at L. 239, April 10, 1869, 16 Stat. at L. 47, and May 4,
1870, 16 Stat. at L. 94.   The plaintiff claims that its
contract called for the conveyance of upwards of
19,000 acres of land, upon which it has paid to the
defendant $192,837.10; that the plaintiff has fully
performed the contract on its part; and that the de-
fendant refuses to perform any of its conditions on
its part to be performed.   In addition to the forego-
ing, constituting the substance of the complaint, that
pleading goes on to state that the lands contracted
for were part of those granted by the acts of Con-
gress referred to; that patents had been issued by
the general government to the defendant including
all of the lands here in question; that for many years
prior to the date of the contract the defendant had
been selling to many people, not actual settlers, quan-
tities of land much greater than quarter-sections, at
prices greatly exceeding $2.50 per acre; that this was
a matter of general knowledge in the vicinity; and

98 Or.—3

that, until about April 30, 1908, the title of the defendant to the realty in question was generally regarded as a perfect title in fee simple, without encumbrance or restriction. The plaintiff avers that it and its predecessors in interest knew and relied upon these facts as constituting a custom prevalent in the community, and had no knowledge of the provisions of the acts of Congress referred to, to the effect that the defendant should sell the lands only to actual settlers thereon, at a price not exceeding $2.50 per acre; but that the defendant well knew the terms of the statutes mentioned. The complaint recites also that the United States filed its bill in equity against the defendant and this plaintiff on January 23, 1909, in the United States District Court for the District of Oregon, averring, in substance, that the defendant had sold the realty in direct contravention of the act of Congress, limiting the sale in quantity and price as stated; that as a result of the litigation a decree was entered, forfeiting the land to the United States government; and that afterwards the plaintiff filed with the Secretary of the Interior a certified copy of the decree, together with its application to purchase all of the lands decreed in that suit to be forfeited to the United States, and paid to the treasury of the United States the sum of $2.50 an acre, whereupon the United States government issued to the plaintiff a patent to all of the lands involved in the contract before mentioned. As a conclusion from all of these statements, in its complaint, the plaintiff demands judgment against the defendant for the amount of money paid as the purchase price. The Circuit Court sustained a demurrer to this complaint, and, the plaintiff having refused to plead further, a judgment was entered that it take nothing, and that the defend-

ant have judgment against it for its costs and disbursements, whereupon the plaintiff appealed.

The controversy hinges upon the effect of the proviso in the acts granting the land to the railroad company, whereby the grantee was required to sell the land to settlers only, and at a price not exceeding $2.50 per acre, and the effect of subsequent Congressional legislation. This portion of the granting acts had the construction of the Supreme Court of the United States in the case of *Oregon & California R. Co.* v. *United States,* 238 U. S. 393 (59 L. Ed. 1360, 35 Sup. Ct. Rep. 908, see, also, Rose's U. S. Notes), and again in the same case in 243 U. S. 549 (61 L. Ed. 890, 37 Sup. Ct. Rep. 443). That suit was one brought by the United States against the defendant, known in the argument as the "main case," to declare a forfeiture to the United States of all of the lands which had not been sold by the company, aggregating 2,300,000 acres. The contention of the government was that the proviso of the acts limiting the amount of land to be sold to actual settlers and the price to be paid therefor was a condition subsequent, the violation of which had utterly forfeited the land to the government. In 238 U. S. 393, the court held in effect that the proviso was not a condition subsequent, but an enforceable covenant. The conclusion of the court is thus stated:

"There was a complete and absolute grant to the railroad company with power to sell, limited only as prescribed, and we agree with the government that the company 'might choose the actual settler; might sell for any price not exceeding $2.50 an acre; might sell in quantities of 40, 60, or 100 acres, or any amount not exceeding 160 acres.' And we add, it might choose the time for selling or its use of the grants as a means of credit, subject ultimately to the

restrictions imposed; and we say 'restrictions imposed' to reject the contention of the railroad company that an implication of the power to mortgage the lands carried a right to sell on foreclosure divested of the obligations of the provisos.''

The result of the litigation as given shape by the opinion of the court when the case was first before it was that, owing to the repeated and extensive violations of the provisos of the acts of Congress, a new situation had arisen calling for a decree of the court to the effect that the railroad company should not only be enjoined from sales in breach of the covenant, but also restrained from making any alienation of the lands whatever, or of the timber thereon, until Congress should have an opportunity to provide by legislation for their disposition as it might deem fitting under the circumstances, and at the same time secure to the defendants all the value the granting acts conferred upon the railroads. An alternative was also expressed that if Congress did not act upon the subject, the defendants might apply to the District Court within a reasonable time not less than six months from the entry of the decree, for a modification thereof, not material to be noted here.

In the act of July 25, 1866, Congress had retained the right to add to, alter, amend, or repeal the granting act at any time, having due regard for the rights of the grantee railroad company. Acting under that reservation, Congress passed the act of August 20, 1912, 37 U. S. Stat. 320, revesting the title to all of those lands in the United States government. After adopting the claims of forfeiture asserted by the Attorney General in or by suits in equity, actions at law or other judicial proceedings instituted pursuant to the joint resolution of Congress approved April

30, 1908, and giving them the same force and effect
as declarations of forfeiture by acts of Congress,
withdrawing the lands reverting to the government
from entry under the public land laws, and placing
certain restrictions on future suits looking to the for-
feiture of any of the lands granted the railroad com-
pany, Section 4 of the act reads thus:

"That the attorney general is hereby authorized to
compromise in the manner hereinafter provided any
suit heretofore or hereafter instituted pursuant to the
provision of said joint resolution approved April
thirtieth, nineteen hundred and eight, involving lands
purchased from the said Oregon and California Rail-
road Company prior to September fourth, nineteen
hundred and eight. In any such suit the attorney
general may, in his discretion, stipulate with the de-
fendant or defendants who purchased said lands, or
are the successors or assigns of such purchaser or
purchasers, that decree shall be entered adjudging
that the lands involved therein have been and are for-
feited to the United States. Such decree shall recite
that the same was entered pursuant to such stipula-
tion. If said purchaser defendant or defendants, or
their successors or assigns, shall within six months
from the entry of said decree file with the secretary
of the interior a certified copy of said decree, to-
gether with an application to purchase all of the
lands adjudged by said decree to have been forfeited
to the United States as aforesaid, and shall pay to
the treasurer of the United States the sum of two
dollars and fifty cents per acre for all of the lands
so applied for, the secretary of the interior shall
cause patents to be issued conveying to said pur-
chaser defendant or defendants, and their successors
and assigns, all of the right, title, and interest of the
United States in and to all of said lands; and such
purchase shall operate as a compromise of any and
all claims of the United States for waste or trespass
upon any of said lands committed by such purchaser
defendant or defendants or their successors or as-

signs, respectively: *Provided,* That the benefits of this section shall not be exercised or enjoyed except in cases where decree shall have been entered pursuant to stipulation entered into as aforesaid: *And provided further,* That the provisions of this section shall not apply to any lands that have not been patented to said Oregon and California Railroad Company: *And provided further,* That the aforesaid privilege of purchasing said forfeited lands shall not be exercised or enjoyed as to less than all of the lands involved in said suits, respectively, the purpose hereof being to prevent the elimination from any purchase of any lands from which timber has been removed or upon which any other waste or trespass has been committed, or the elimination of any part whatever of any land from such purchase.''

Section 5 makes the act inapplicable to what has heretofore been designated as the main suit. Section 6 reads as follows:

''That nothing in this act contained, nor action taken pursuant to the provisions of this act, shall be construed as a condonation of any of the breaches of any of the conditions or provisions annexed to any of the grants designated in said joint resolution approved April thirtieth, nineteen hundred and eight, nor as a waiver of any of said conditions or provisions, nor as a waiver of any right of forfeiture in favor of the United States on account of any breach or breaches of any of said conditions, nor as a waiver of any cause of action or remedy of the United States on account of any breach or breaches of any of said conditions or provisions, nor as a waiver of any other rights or remedies existing in favor of the United States.''

Notwithstanding the voluminous briefs and extended arguments as between the parties to this suit, the matter in controversy is brought within a simple and narrow compass. The defendant contracted to sell the land to the plaintiff. The latter had per-

formed its part of the executory contract. While it was still in process of execution awaiting its completion by the conveyance of the fee-simple title to the land yet to be performed by the defendant, the government reassumed the title to the land. This was attributable to the defendant's breach of what the Supreme Court of the United States has decided to be its enforceable covenant. The law had not forbidden the plaintiff to buy the land. It has committed no wrong. It was not a party to the covenant. One party cannot violate another party's covenant. When it discovered that the defendant could not convey and had not conveyed anything, the plaintiff was entitled to recover the money it had paid, upon the simple principle that it had paid for something which it had not received.

It is said in argument that the plaintiff received the benefit of its contract with the defendant. This is fallacious. The general government had forfeited whatever title the defendant had in the land. Under the sixth section of the act referred to, the government reserved all remedies against the defendant. It has no right to any benefit under that act. Having given nothing, it cannot keep anything it received. It is said in the fourth section that the Attorney General is authorized to compromise pending suits "in the manner hereinafter provided." Later in the same section those in the situation of the plaintiff here were authorized to pay to the United States, after the title had been forfeited to the government, $2.50 an acre, and buy, not from the defendant, but from the government direct, all of the lands mentioned; and the act expressly gives the extent of the compromise in these words:

"And such purchase shall operate as a compromise of any and all claims of the United States for waste or trespass upon any of said lands committed by such purchaser defendant or defendants or their successors or assigns, respectively."

The extent of the compromise is thus limited and defined. There was no compromise respecting the actual title of the land. It was taken away from the defendant as fully and decisively as could possibly be, and reverted to the government. By the first section of the act, the suit itself, already begun by the Attorney General, was declared equivalent to forfeiture by act of Congress. There was no reason for compromise as to the title, and none was contemplated by the statute. It is not a case where the purchaser gets a partial estate from the seller, which he is entitled to perfect by purchasing an outstanding title more or less paramount. Having received nothing from the defendant, there was nothing for the plaintiff to return to the seller. When the latter's title came to naught by reason of its breach of the covenants connected with its creation, at that moment the plaintiff was entitled to recover the money it had paid. The situation presented is equivalent to one in which the purchaser from A. has gone into possession and has been ejected by B. under paramount title. The purchaser has not bought his peace as to the title. He has been forced to surrender the title and has become a stranger to it. That he afterwards buys it from the true owner or effects a compromise for the trespass or damage done by him while in possession does not in any degree lessen the liability of A., his former grantee, to refund to him the full purchase price paid. If the plaintiff had procured the right to purchase the land from the gov-

ernment by any act or assistance of the defendant, there would be some ground for the argument that the plaintiff, having received the benefit of its contract, cannot now repudiate it and recover the money without placing the defendant *in statu quo*. But the record shows that the plaintiff secured the right to purchase, not on account of any act of the defendant, but in spite of it. The defendant's conduct led to the utter destruction of the title, so that the plaintiff received nothing. The money paid is in very truth the property of the plaintiff, and to allow the plaintiff to recover only $2.50 per acre, the amount paid to the government, would be permitting the defendant to reap where it had not sown. Before the enactment by Congress of the statute of August 20, 1918, a cause of action had arisen in favor of the plaintiff and against the defendant, as for money had and received to the use of the plaintiff. That chose in action for the full purchase price it paid was the property of the plaintiff. To hold now that it cannot recover any of it, or at best only a fourth of it, is to say that, by the enactment mentioned, Congress intended to confiscate that property or the most of it, and not only so, but to confiscate it for the benefit of the defendant, which gave nothing for it. There is no hint of such an intent in the language of the statute, and it cannot be assumed. If that law is to be given the effect of preventing the plaintiff from recovering all it paid, it would impair the obligation of the defendant to repay the money it had taken from the plaintiff without giving anything in return. The obligation of this implied contract was in full force when the statute was enacted, and cannot be impaired by subsequent legislation. The plaintiff acquired the right to purchase the land from the government, not

because of any title that the defendant ever had, but because that title had been extinguished; and nothing passed to the plaintiff by reason of the contract.

For the purposes of this case it matters not whether the contract between the plaintiff and the defendant was or was not illegal, or whether or not the parties are equally to blame. If the contract was legal, the plaintiff was entitled to treat the failure of the defendant to perform as a rescission thereof, and recover the purchase price already paid. If the contract was illegal, it was yet in its executory stage, so that within the principle announced by this court in *Leadbetter* v. *Hawley,* 59 Or. 422 (117 Pac. 289, 505), the plaintiff could recover the money.

All the cases cited by the defendant on this point are those where the effort of the plaintiff had been to enforce the illegal contract. For instance, in *Jackson* v. *Baker,* 48 Or. 155 (85 Pac. 512), the defendant had contracted with the plaintiff and another that as soon as he should obtain title to his homestead, they should pay him $1,000, in consideration of which he agreed to convey the title, when acquired, to Draper, but that, if he was unable to acquire title, he should repay the $1,000. Having failed to perfect his homestead entry, he was sued by the plaintiff for recovery of the $1,000. Thus, it is seen that one of the stipulations of the contract was that he should repay the money in certain contingencies, and the action was brought to enforce that illegal agreement. The litigation was clearly an affirmance of contract, and not a disaffirmance. The same is true of *Kremer* v. *Earl,* 91 Cal. 112 (27 Pac. 735). That was a suit to enforce specific performance of a contract to convey land, the title to which the defendants should thereafter acquire from the state for the sole use of the purchaser. In substance, it was required by the

statute under which the state sold the land that the purchaser should declare that no contract had been entered into looking to its alienation. Yet he had made such an agreement, and because of its illegality the court refused to enforce specific performance of it. The other citations of the defendant on this branch of the case are affected by the same principle. Here, the litigation is clearly not in affirmance of the contract said to be illegal. The place of repentance for the plaintiff had not yet been passed at the time it was instituted. The demurrer should have been overruled, but the plaintiff is entitled to recover the full purchase price which it has paid.     REVERSED.

Mr. Justice BENSON concurs in this opinion.