Argued November 26, 1946; affirmed January 15; rehearing
denied February 18, 1947

STATE ex rel. PETERSON *v.* MARTIN

(176 P. (2d) 636)

*Samuel B. Weinstein,* of Portland (with George Neuner, Attorney General of the State of Oregon, on brief), for respondent.

*Francis F. Yunker,* of Portland (with Otto W. Heider, of Sheridan, on brief), for appellant.

Before BELT, Chief Justice, and ROSSMAN, BAILEY, LUSK, BRAND and HAY, Justices.

HAY, J.

This suit was instituted by the State of Oregon on the relation of E. L. Peterson, as director of the State Department of Agriculture, to enjoin the defendant, A. L. Martin, from selling fluid milk to the general public within the city of Sheridan, Oregon, without being licensed as a milk dealer under the provisions of the Oregon Milk Control Act (sections 34-1001 to 34-1018, O. C. L. A., as amended by chapter 120, Or. L. 1943). The complaint, by appropriate allegations, charged the defendant with repeated, persistent and intentional violations of the Act in that regard.

The answer of defendant was in the main a general denial, with an affirmative defense to the effect that, on or about December 31, 1945, the relator, pursuant to the provisions of the Act, granted defendant a license to operate as a milk dealer and distributor within the district of Willamina and Sheridan, Oregon. For reply, the relator alleged that, upon application by the defendant for a renewal of a license held by him to sell fluid milk in Willamina, in which application he included Sheridan within the territory to be covered, an employee of the Department of Agriculture, with-

out checking the application with reference to the extent of the territory, by inadvertence and mistake unintentionally issued to the defendant a license purporting to authorize him to distribute fluid milk and cream in the city of Sheridan; that, shortly thereafter, the Chief of the Milk Control Section of the Department of Agriculture discovered such mistake, and immediately, on January 8, 1946, notified the defendant thereof, and on the same date transmitted to him, by registered mail, a corrected license for the year 1946; that the defendant refused to accept such registered mail, and has refused a demand for the return of the license for cancellation. The reply further alleges that the alleged license in question was issued without authority, and that the defendant was at all times aware that the relator was opposed to the granting of such a license to him and knew that it was issued by inadvertence and mistake.

The circuit court, after a hearing, entered a decree enjoining the defendant as prayed for. Defendant appeals.

There is not a great deal of conflict in the evidence. Mr. Martin is the owner of a dairy at Sheridan. In 1945, he held a producer-distributor license to sell fluid milk and cream suitable for human consumption in the city of Willamina and vicinity. He applied for a license to sell and distribute milk within the city of Sheridan. A hearing was held on such application, and, on April 30, 1945, the director of the Department of Agriculture (whom we shall refer to as the administrator) made findings to the effect that the city of Sheridan was amply supplied with milk and cream suitable for human consumption; that the distribution facilities then existing were adequately serving the demands of the con-

sumers; that the daily sales of fluid milk and cream in that market aggregated approximately 450 quarts, and that such quantity was not sufficient to justify additional distribution facilities; that the granting of a milk dealer's license to the applicant would "displace" the milk produced for human consumption by existing producers supplying the market, would result in a surplus of fluid milk, and would jeopardize the maintenance of the existing production and distribution facilities; that such duplication of distribution facilities would be economically wasteful, would ultimately result either in decreased prices to existing producers or in increased prices to consumers, or both, and would bring about a condition not in the public interest and harmful to a stabilized production and distribution of fluid milk and cream. Based upon such findings, the administrator made an order denying Mr. Martin's application. Upon a writ of review, the Circuit Court for Yamhill County, after a hearing, sustained the findings and order of the administrator.

Mr. Thomas L. Ohlsen is Chief of the Milk Control Section of the Department of Agriculture. The administrator delegated to Mr. Ohlsen the authority to issue renewal licenses, from year to year, in cases where the applicants for such renewals had complied with the requirements of the Act and the regulations of the Department, and where the territory covered by their licenses remained unchanged. The administrator testified that, when applications for new licenses or for extension of the territory covered by existing licenses were involved, he reserved the authority to rule upon the applications personally, and that the normal procedure had been to hold a hearing thereon.

Mr. Cecil L. Griggs, a statistician in the employ of the department, testified that it was a part of his duty to inspect applications for licenses, and in that connection to check them with respect to whether or not the applicants, if previously licensed, had paid their regular monthly poundage fee, whether or not the ownership of the dairy was unchanged, and whether or not the territory applied for was the same as it was in the previous year. When an extension of territory or a different territory was applied for, it was his practice to underline with red pencil the description of the territory, attach a slip to the application calling attention thereto, and refer the matter to Mr. Ohlsen. In the event that the application was for a simple renewal of the license held by the applicant in the preceding year, it was then referred to Mr. Ohlsen's secretary, who was authorized to prepare the certificate of license in accordance with the application, and to place thereon a rubber-stamp impression of Mr. Ohlsen's signature. Mr. Griggs testified further that, apparently, he had failed to check the territory covered by Mr. Martin's application, had permitted the application to pass through his hands without observing that additional territory was applied for, and had not referred the matter to Mr. Ohlsen. Hundreds of applications were passing through his hands at that time of year. Mr. Ohlsen testified that he had received authority from the administrator to issue renewal licenses where the applicants were applying for the same territory that they had held the previous year, and, in some instances, where additional territory was asked for, and he had determined, after investigation, that such territory was either not served at all or not adequately served. Where application was made for ex-

tension of territory or for new territory, and the territory applied for was already adequately served, his only authority was to refer the matter to the administrator. He had authority to issue licenses for new or extended territory (apparently as an emergency measure) in cases involving some of the smaller markets, in which, during the war, the distributors had discontinued operations and had left the people without a supply of milk. He denied specifically that the rubber-stamp facsimile of his signature which appears upon Mr. Martin's certificate of license was affixed thereto by his authority. Mr. Martin's application was issued sometime between January 4th and 8th, 1946. Mr. Ohlsen's attention was called to the error on January 8th. He telephoned Mr. Martin immediately, informed him of the error, and, on the same day, sent him a formal notice by registered mail, with a corrected license covering only the same territory that Mr. Martin had in 1945. Notwithstanding the restrictions upon his authority to issue licenses, all milk dealers' licenses issued by the Department bear a rubber-stamp facsimile of Mr. Ohlsen's signature. None are signed by the administrator personally. Mr. Griggs had no authority to approve licenses for new territory without Mr. Ohlsen's sanction.

Upon this appeal, the defendant urges that the principal point to be determined is whether or not a court of equity will issue an injunction in cases of this kind, where violations of the Act may be dealt with adequately by criminal prosecution. The Act penalizes violations by a fine of not less than $25 nor more than $1,000, or by imprisonment in the county jail for not less than 30 days nor more than 90 days, or by both such fine and imprisonment. Section 34-1017, O. C. L. A.

■ The injunctive powers of equity are not exercised ordinarily in aid of the enforcement of a criminal statute. High on Injunctions, 4 ed., section 20; Anno., Ann. Cas. 1914 A, p. 440; 28 Am. Jur., Injunctions, section 148; *In re Debs,* 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092. The fact that a remedy at law has been provided, however, is not, in all cases, a sufficient objection to the exercise of the remedy by injunction. Where the acts of a defendant are such that they constitute either a public or a private nuisance, injunctive relief may be had. *Gaston v. Thompson,* 89 Or. 412, 422, 174 P. 717; *Columbia Fishermen's Union v. St. Helens,* 160 Or. 654, 659, 87 P. (2d) 195; *Kentucky State Board Dental Examiners v. Payne,* 213 Ky. 382, 385, 281 S. W. 188; *State ex rel. La Prade v. Smith,* 43 Ariz., 131, 29 P. (2d) 718, 791, 92 A. L. R. 168. It was admitted by Mr. Martin that he was daily selling and offering for sale, within the city of Sheridan, fluid milk for human consumption. Each sale (unless the defendant was licensed) was a separate violation, and the admitted conduct of the defendant constituted open and continuous violation of a statute reasonably calculated to preserve the public health. The Act was intended, in its operation, to safeguard the public health by providing an adequate supply of wholesome milk for human consumption. Persistent and continuous violation of such a statute constitutes a public nuisance, and it is apparent that equitable relief by way of injunction will provide more adequate protection of the public interests than would a criminal prosecution for each separate violation. *State v. Lindsay,* 85 Kan. 79, 116 P. 207, 208, 35 L. R. A. (N. S.) 810; *United States v. Shissler,* 7 F. Supp. 123, 128; 28 Am. Jur., Injunctions, section 148; Cf. Anno., 92 A. L. R.,

173, 174; *Fitchette v. Taylor,* 191 Minn. 582, 254 N. W. 910, 94 A. L. R. 356, 358.

■ Evidence on the part of the defendant was received under the rule, tending to prove that, prior to the time when defendant entered the Sheridan field, the city had no house-to-house delivery, and that the milk supplied by defendant was of superior quality to that theretofore sold. Defendant suggests that, under such circumstances, he cannot be charged with having created a public nuisance. Upon that question, however, (even if it were pertinent, which, in view of the fact that the comparative quality of the milk was not in issue, it was not) the findings of the Circuit Court for Yamhill County were against him. No appeal was taken from that court's decision, and it is now res judicata.

It is contended that the Act does not vest the administrator with discretion whether to issue or to refuse to issue a milk-distributor's license to a properly qualified applicant. The argument is that if the administrator has no discretion to refuse to issue a license, then, by a parity of reasoning, it follows that, except for violation by the licensee of specific provisions of section 34-1006, O. C. L. A., (none of which are involved in the present case) he is without authority to revoke a license.

The administrator, on the other hand, insists that the Act is designed to regulate the whole range of activity involved in the production, distribution, manufacture, storage and sale of fluid milk for human consumption. The evils which the legislature sought to remedy included those of cut-throat competition among dealers, excessive and duplicate milk routes, spasmodic and irregular supply of wholesome milk to the con-

sumers, and a depression of prices to the producers. The administrator suggests that it is obvious that, to remedy those evils, the legislature intended to invest him with power to adopt such reasonable regulations as would tend to further the general purposes of the Act. The broad aspects of the problem of the regulation of the milk industry, as set forth in the preamble of the Act, include the establishment and maintenance of reasonable returns to producers and distributors, as well as the fixing of a reasonable price to be paid by consumers. We quote from the preamble, as follows:

"Whereas the production and distribution of milk and cream is a paramount industry upon which to a substantial degree the prosperity and health of the people of the State of Oregon depend; * * *

"Whereas unhealthful, unfair, unjust, destructive and demoralizing economic trade practices have grown up and are now carried on in the production, sale and distribution of milk and cream * * * which impair the dairy industry in the state and the constant supply of pure wholesome milk to the inhabitants thereof, and constitute a menace to the health and welfare of the inhabitants of the state; and

"Whereas in order to protect the well-being of the people of the state of Oregon and promote the public welfare, the production, transportation, manufacture, storage, distribution and sale of milk and cream in the state hereby is declared a business affecting the public health and interest which should be supervised and controlled in the manner hereinafter provided; * * * "

The defendant, citing *Savage v. Martin,* 161 Or. 660, 91 P. (2) 273, maintains that the Act does not contain sufficient basic standards for the guidance of the administrator in determining the existence of a state of facts justifying his refusal to issue a license. Section

34-1009, O. C. L. A., empowers the administrator to classify licenses, to limit them to a particular city or village, or to a particular market or markets, and to define what shall constitute a natural market area. A market is defined to include ordinarily no more than one city or town together with reasonably contiguous territory. When two or more towns or cities are so closely adjacent to one another that they comprise but one natural market area and are subject to the same marketing conditions, such adjacent towns or cities and contiguous territory may be included in one market area. A market area may include only territory in which conditions involved in the processing and distribution of milk are similar. It was necessary, of course, to leave to the determination of the administrator the question of the existence of the required facts upon which the status of an area as a natural market depends. Defendant does not contend that the Act is unconstitutional in this respect, but only that it does not contain sufficient standards to give discretion to the administrator whether to grant or to refuse a license.

In *Dellwood Dairy Co., Inc., v. Noyes,* 263 App. Div. 923, 32 N. Y. S. (2d) 411, the court upheld an order of the Commissioner of Agriculture denying the application of a licensed milk dealer for an extension of the area to which his license appertained. In interpreting the New York Milk Act, the commissioner had taken into consideration evidence as to the extent of the applicant's current operations in milk delivery, the number of routes handled by him, the amount of milk sold to consumers on retail routes as compared to the amount sold to stores, and the fact that an increase in the amount sold to stores and a decrease in the amount sold

to consumers on retail routes had resulted in a considerable loss of business to the licensee. It was held that neither competitive loss nor the hazards of inefficient operation were, in themselves, sufficient grounds to justify the extension applied for, in the absence of a positive showing that the extension, if granted, would be in the public interest and would not tend to destroy a market already adequately served.

In *Matter of Dusinberre v. Noyes,* 284 N. Y. 304, 31 N. E. (2d) 34, the Commissioner of Agriculture had rejected a similar application. The commissioner's action was reversed by the appellate division, but the court of appeals reversed and reinstated the order of the commissioner. That court said, in part, as follows:

"The Appellate Division has held, in effect, that the Commissioner is not concerned with economic questions affecting the return which the producer would receive. 'The statute', it is said, 'does not make respondent the guardian of the farmer; whether they succeed or fail in their proposed venture will not affect him. The statute does not vest him with any authority to decide such an issue.' (259 App. Div. 582, 584.) It is true that the statute is not intended for the protection of a dealer who may propose to engage in an ill-advised venture, nor does it give the Commissioner power to reject an application for a license, otherwise in the public interest, merely because he doubts whether the dealer's anticipations of profits will be realized. If an applicant 'is qualified by character, experience, financial responsibility and equipment to properly conduct the proposed business' and if 'the issuance of the license will not tend to a destructive competition in a market already adequately served,' and if 'the issuance of the license is in the public interest,' the Commissioner may not reject an application for a license; but the Legislature has en-

trusted to the Commissioner the duty of determining whether an applicant has shown facts which entitle him to the grant of the license. Within that field he is charged with responsibility and must exercise discretion and judgment. He may be required to make findings of fact sufficient to enable a court to determine the question whether the rejection of an application for a license is reasonable and in accord with the rule or standard formulated by the Legislature; but where findings of the Commissioner give reasonable support to his conclusion and the findings in turn are supported by the evidence, a court should not substitute its judgment for the judgment of the Commissioner charged by the Legislature with responsibility.

"The matters which may properly be considered by the Commissioner cannot be determined by any rigid general rule applicable in all cases. Substantial evidence sustains the findings of the Commissioner that 'if a license is granted to the applicants, it will tend to disturb the stability of the market, and bring about a decreased return to producers. In short, it will tend to a destructive competition in a market already adequately served, and it does not appear to be in the public interest'."

In *Nebbia v. New York,* 291 U. S. 502, 78 L. Ed. 940, 54 S. Ct. 505, 89 A. L. R. 1469, it was held that, so far as the requirements of due process are concerned, and where no other constitutional restrictions prevent, a state may adopt whatever ecomonic policy may reasonably be deemed to promote the public welfare, and may enforce such policy by legislation. The supreme court said that legislative interference with the free operation of the normal laws of competition in trade or commerce, whether wise or unwise, involves an economic question which courts may not consider, provided the legislative policy be to curb, by measures not arbitrary

or discriminatory, unrestrained and harmful competition. The legislature is primarily the judge of the necessity of such legislation, and every possible presumption in favor of its validity will be invoked. The phrase "affected with a public interest" means no more than that an industry, for adequate reasons, is subject to control for the public good.

In *Savage v. Martin,* supra (161 Or. 660, 91 P. (2d) 273), this court held that the milk industry is a legitimate subject of state regulation under the police power. Such power of regulation may be used only to correct some evil or abuse found by the legislature to exist. "The evils which the Oregon Milk Control Law are intended to correct are chiefly economic ones, and substantially those which in New York and other states the legislatures deemed adequate basis for the enactment of similar legislation." Those evils are recited in the preamble of the act, and, as so recited, in the absence of countervailing evidence, must be given verity by the court. *Nebbia v. New York,* supra, is cited and approved. "The law clearly contemplates the establishment of a natural marketing area. The standard would be violated, for example, if a portion of Tillamook County were included in the Salem market area." The legislature has not given the administrator "unfettered discretion", as described by the supreme court in *Schechter Poultry Corp. v. United States,* 295 U. S. 495, 55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947, "but on the contrary * * * has hedged about the board's authority with definite restrictions, which must be observed or its action is unlawful. The standards set up, in our opinion, are legally sufficient and the legislature has not delegated its power to make law, but has only conferred upon the board authority to make administrative rules."

■■ The administrator's denial of a license to Mr. Martin to sell milk in the city of Sheridan had the effect of limiting his license to the market comprising the city of Willamina and contiguous territory. As the administrator had determined that the Sheridan market was already adequately served, and that the granting of a license to an additional distributor to sell milk therein would be economically wasteful, not in the public interest, and harmful to a stabilized production and distribution of fluid milk and cream for human consumption, we are of the opinion that the refusal of the administrator to permit Mr. Martin to enter the Sheridan market area was a reasonable exercise of a valid discretionary power vested in the administrator by the Act. The existence of facts justifying the administrator's action, after due notice and a hearing, is presumed, and there was no competent evidence in the record to overcome such presumption. *Savage v. Martin,* supra.

■ We hold that the standards set up by the Act are sufficiently adequate to guide the administrator in his determination of the propriety of issuing or refusing to issue a license.

■ The director is the executive officer of the Department of Agriculture. Section 29-103, O. C. L. A. He is authorized, for purposes of administration, to organize the work of the department under specific divisions, including a division of foods and dairies. Section 29-104, O. C. L. A. He may employ such expert and other assistants and employees as he may deem necessary, and assign to them such duties and responsibility as he may judge desirable. Section 29-107, O. C. L. A. The granting of a license involves the exercise of discretion, and only the director is vested

with discretion in the premises. The issuance of the certificate of license, after the director, in his discretion, has directed that one shall issue, is a mere ministerial act, the execution of which may be delegated. *Antin v. Union High School District,* 130 Or. 461, 469, 280 P. 664, 66 A. L. R. 1271; 43 Am. Jur., Public Officers, section 258. Renewal of a license, upon the same terms and covering the same territory, would appear to be a ministerial act, authority to perform which may be delegated. It was proper, therefore, for the director, after approving the issuance of a license, to delegate to a subordinate employee the ministerial act of issuing the certificate, or even to delegate the issuance of a renewal certificate where no change in conditions, involving the exercise of discretion, has intervened.

■ In this connection, it is to be observed that, under the circumstances of the present case, there is a distinction to be drawn between the license itself and the certificate of license. While, in strict propriety, the term "license" refers to the right or privilege conferred, and the certificate of license is merely the written document which evidences such right, it must be conceded that "license" is used frequently by courts and by textwriters to signify impartially both the right and the certificate. *Quinnipiac Brewing Co. v. Hackbarth,* 74 Conn. 392, 50 A. 1023; *Elmore v. Overton,* 104 Ind. 548, 4 N. E. 197, 54 Am. Rep. 343; 12 Am. Jur., Contracts, section 10. Here, however, the distinction becomes important, as the license could be granted only by the director, whereas the issuance of the certificate might be delegated to a subordinate.

▬▬ The certificate, in this instance, having been issued inadvertently by a subordinate, not only without authority from the director but, in fact, contrary to his

explicit instructions in such cases, was not merely voidable, but void. While, in many cases, private persons may be bound by the unauthorized acts of their agents done within the scope of their regular employment a different rule is applicable in respect of the unauthorized acts of public agents. Where a public agent acts in violation of his specific instructions, the state is not bound by his acts, "for the reason that it is better that an individual should occasionally suffer from the mistakes of public officers or agents, than to adopt a rule which, through improper combinations or collusion, might be turned to the detriment and injury of the public." *Whiteside v. United States,* 93 U. S. 247, 23 L. Ed. 882.

A void act is a mere nullity, and has no legal effect whatever. *Booth-Kelly Co. v. Oregon etc. R. Co.,* 98 Or. 21, 31 193 P. 463; 12 Am. Jur., Contracts, section 10; Pollock, Principles of Contract, 10th ed., p. 8. The certificate of license, therefore, conferred upon Mr. Martin no rights whatever. Being void, no formal proceeding to revoke it was necessary. It required no disaffirmance to avoid it. *Booth-Kelly Co. v. Oregon etc. R. Co.,* supra. Within a very few days after he received the certificate, Mr. Martin was notified by the administrator that it had been issued inadvertently. In the interim, it does not appear that he incurred any obligations or suffered any detriment on the faith of the certificate. Although the law requires notice and a hearing before revocation of a license, neither notice nor hearing should be an essential preliminary to the cancellation of a void certificate of license. *State v. Charlesworth,* 141 Or. 290, 16 P. (2d) 1116, 17 P. (2d) 1104, cited by Mr. Martin, which involved the suspension of a duly and regularly issued permit for the sale of corporate securities, is not in point.

No formal order was made by the administrator denying Mr. Martin's application for extension of territory, and it is suggested that failure to make such order should militate against the relator herein. An order should have been made, of course, as, under the Act, the only remedy given to an unsuccessful applicant for a license is the right to test the propriety of the administrator's action by writ of review to the circuit court. Section 34-1008, O. C. L. A. Mr. Martin's attitude, upon being informed of the recall or avoidance of the certificate of license, was somewhat evasive. He virtually ignored the administrator's telephonic communication, and afterwards refused to accept the registered letter containing the formal notification. If the administrator, upon request, after rejecting his application, had refused to make a formal order in the premises, no doubt he might have been compelled, by mandamus, to do so. There is no reason to assume, however, that the administrator would have refused to make the order, if Mr. Martin had requested that it be made, and, under the circumstances, such a request might have been deemed an essential preliminary to a petition in mandamus. 34 Am. Jur., Mandamus, section 126. The point, however, does not properly arise in this case. It is apparent from Mr. Martin's actions in ignoring the administrator's communications and in continuing to sell milk in Sheridan after being advised of the recall of his certificate of license, that he was determined to make his stand upon the asserted validity of his purported license.

Upon reason and authority, we are satisfied that the decision of the trial court was free from error. The decree is affirmed, with costs.

ROSSMAN, C. J.,* dissents.

---

* Became Chief Justice January 6, 1947.