Argued December 8, 1938; affirmed June 6, 1939

SAVAGE ET AL. *v.* MARTIN ET AL.

(91 P. (2d) 273)

In Banc.

*Custer E. Ross* and *W. C. Winslow*, both of Salem, for appellants.

*A. E. Clark,* of Portland (with Willis S. Moore, Assistant Attorney General, of Salem, Samuel B. Weinstein, Clark & Clark and R. R. Bullivant, all of Portland, on brief), for respondents.

LUSK, J. This is an appeal from a decree of the Circuit Court for Marion county dismissing a suit brought by the plaintiffs for the purpose of obtaining a decree enjoining the defendants, the governor and the attorney general of the state of Oregon, the district attorney of Marion county, and the members of the Milk Control Board of the state of Oregon from enforcing the board's

Order No. 107, made pursuant to the provisions of the law known as the Milk Control Act (Ch. 72, Oregon Laws, Second Special Session 1933, as amended by Ch. 67 and Ch. 69, Oregon Laws, Special Session 1935).

The plaintiffs assert that as to them certain provisions of the act are unconstitutional and void and the order therefore lacks legal sanction.

The Milk Control Act regulates the production, distribution and sale of milk in certain sections of this state. It provides for the creation of a Milk Control Board of three members to be appointed by the governor (§ 2); invests the board with power "to supervise and regulate the milk industry of the state" (§ 3); requires all milk dealers to be licensed (§§ 4, 5, 6, 7 and 8), a milk dealer being defined as any person who purchases or handles milk within the state except when consumed on the premises where sold; authorizes the board to fix the minimum wholesale and retail price to be charged for milk handled and sold within the state for human consumption in fluid form, and makes unlawful sales at a price less than fixed by the order of the board (§ 12); empowers the board to define and limit the geographical area from which fluid milk shall be produced for any given market or sales area, and provides for the pooling and averaging of all returns from the sales of fluid milk and the payment to all producers of a uniform pool price for all milk so produced (§ 13, as amended by § 2, Ch. 69, Oregon Laws, Special Session 1935).

The order under attack was issued to become effective May 15, 1936. It fixes the boundaries of the "Salem sales area" and of the "Salem production area" within which the order is to operate; prescribes a formula to be applied in determining the so-called "basic quotas"

of producers and producer-distributors supplying milk for human consumption in the Salem sales area; and provides for a "basic pool" and a "surplus pool" into which proceeds of sales of milk shall be credited and from which payments shall be made to producers under a method which will be hereinafter explained in some detail.

The plaintiffs, W. E. Savage and Bruce Fox, are producers and distributors of Grade "A" raw milk, who bring the suit on behalf of themselves and all other producer-distributors supplying milk to the Salem market. The word "plaintiffs" will be used in this opinion as referring to all such producer-distributors. "Producer-distributor", as defined in the order and as shown by the testimony, "means any producer who maintains his own herd, prepares and puts in containers for human consumption the milk produced from such herd, and distributes or sells, either partially or exclusively, his own product direct to stores or consumers".

Before the amendment of 1935, producer-distributors were required to observe the minimum price regulation, but were not subject to the pooling provisions of § 13. The purpose of the amendment was to bring them within the operation of that section.

Section 12 provides that where by "municipal ordinance, various grades of milk are specified the board shall fix the minimum price as aforesaid, applicable to each grade".

Under the standard milk ordinance in the city of Salem, approved May 26, 1930, and ever since in full force and effect, Grade "A" raw milk is milk the average bacterial count of which does not exceed 30,000 per cubic centimeter, while Grade "B" raw milk is milk

the average bacterial count of which at no time prior to delivery exceeds 200,000 per cubic centimeter. There are certain sanitary requirements in the ordinance governing the production of Grade "A" raw milk which do not apply to Grade "B" raw milk. Grade "A" raw milk is bottled by the producers and sold by them directly to stores and consumers. Grade "B" raw milk is not sold for human consumption until after it has been pasteurized, when it is known as Grade "A" pasteurized milk. At no time after pasteurization and until delivery may its bacterial count exceed 30,000 per cubic. centimeter. After it is pasteurized Grade "B" raw milk is known as Grade "A" pasteurized.

In their complaint the plaintiffs allege substantially the following facts: They are duly licensed to pursue their occupation as producers and distributors of milk; have paid the poundage fees prescribed by Ch. 67, Oregon Laws, Special Session 1935, and have observed and maintained the schedule of minimum prices fixed by the Oregon Milk Control Board. In order to comply with the Salem ordinance and to produce the highest grade of pure and wholesome milk the plaintiffs have invested large sums of money in plant and equipment which they maintain at a high cost. Grade "B" milk and Grade "A" pasteurized milk are inferior to Grade "A" raw milk and the cost of producing them is substantially less. They compete with Grade "A" raw milk in the retail trade in Salem, Oregon. There has never been a surplus of Grade "A" raw milk in the Salem milkshed, while there has been and is now a surplus of Grade "B" milk over and above the requirements for that kind of milk in the Salem milkshed.

The board arbitrarily and over the protests of the plaintiffs made its order for the classification of milk

produced in the Salem milkshed and classed together for production quotas, pooling and surplus purposes, Grade "A" raw, Grade "B" raw, and Grade "A" pasteurized; and the board is threatening to collect from producer-distributors the difference in money between 58½ cents per butterfat pound and 56.2269 cents per butterfat pound because of a surplus of Grade "B" milk, and if the collections are made will apply them, less administrative expenses, to the credit of producers of Grade "B" and Grade "A" pasteurized.

The board's order attempted to establish the basic quotas for producer-distributors on the basis of the average production for 1935. During 1935, and since, the population of the Salem milkshed has materially increased and the demand for Grade "A" has materially increased. Producer-distributors have increased their output to meet said demand and have not created a surplus. By the order the board has levied an assessment against producer-distributors based upon the increase of their product over the amount of their basic quotas, and proposes to collect this assessment and apply it to the credit of the producers of Grade "B" and Grade "A" pasteurized. The proposed action is arbitrary, not based upon any reasonable classification or other reasonable ground, and is solely a method of the board to levy a tax upon the producers of Grade "A" for the benefit of producers of Grade "B" and Grade "A" pasteurized. While the order pretends to proceed upon the theory that there is a surplus, this surplus is entirely of Grade "B" and Grade "A" pasteurized. The minimum price established is the same for Grade "A" raw, Grade "B" and Grade "A" pasteurized.

It is charged that § 2, Ch. 69, Oregon Laws, Special Session 1935, and Order No. 107 are unconstitutional,

in that they take plaintiffs' property without due process of law in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States, and without just compensation in violation of § 18, Art. I of the Constitution of Oregon; deprive plaintiffs of the equal protection of the laws in violation of the Fourteenth Amendment to the Federal Constitution and § 20, Art. I of the Oregon Constitution; and that the section delegates legislative powers of the Milk Control Board in violation of § 1, Art. IV of the Oregon Constitution, which vests the legislative power in a legislative assembly and the people through the initiative and the referendum, and that in violation of § 21, Art. I of the Oregon Constitution, the taking effect of the law depends upon an authority otherwise than as provided in the constitution.

Order No. 107 was promulgated under authority granted by § 2 of the 1935 act (an amendment to § 13 of the original act which will hereinafter be referred to as § 13), which provides:

"It is recognized that, due to seasonal fluctuations in milk production, and other causes, there occurs in certain markets in the state a surplus of fluid milk suitable for human consumption, under the laws and ordinances in force in such markets, in excess of the quantities sold as fluid milk for human consumption, and that such surplus varies from day to day and from season to season; that such surpluses must be sold for factory or other purposes at prices usually lower than would be received if sold in the fluid milk trade; and that to stabilize and promote the milk industry it is necessary that uniform prices be paid to all producers who, either directly or through any corporation or co-operative association, furnish milk to any specified market.

"To accomplish these necessary purposes the board shall have power: (a) to define and limit the geographi-

cal area from which the fluid milk shall be produced for any given market or sales area as fixed and designated by the board, provided that producers, producer-distributors or their successors now shipping to any market may continue so to do until they voluntarily discontinue shipping to designated milkshed; and (b) under uniform rules and regulations to determine what proportion of the milk produced by each producer shall be considered as marketed as fluid milk for human consumption and what proportion so produced shall be considered as surplus; and (c) to provide for the pooling and averaging of all returns from the sales of fluid milk produced in the geographical area from which fluid milk shall be produced for a designated market or sales area, and the payment to all producers of a uniform pool price for all milk so produced, subject to such equitable adjustments as shall be made by the board and subject to such rules and regulations as may be imposed for the control of surplus production by the establishment of basic averages or other methods; and (d) to appoint, set up, select and employ agencies for the handling and disposal of the surplus fluid milk, keep, or supervise the keeping of all accounts and records necessary in connection with such transactions, and receive and disburse the funds received in connection therewith; and (e) to make reasonable deductions from the funds so received to pay all necessary expenses incidental to the performance of the duties and the execution of the powers herein conferred, and (f) make any other and further order, rule or regulation and exercise any such further power that may be deemed necessary by the board for the full accomplishment of the aforesaid objects.''

The order recites that evidence submitted at public hearings and records and information in possession of the board indicate, that during the year 1935, in the Salem sales area, there was a daily average consumption of fluid milk and cream in the bottle and can trade of approximately 820 butterfat pounds, of which pro-

ducer-distributors supplied approximately 290 butter-fat pounds and Grade "B" producers 530 butterfat pounds; and that 530 butterfat pounds, average daily sales supplied by Grade "B" shippers in such area, is exceeded by the present basic quotas to the extent of approximately 12½ per cent. (A basic quota or basic average, according to the evidence, is a particular producer's share of the bottle and can outlet of the market, based on previous experience had over a certain period).

The order next directs that the aggregate of all basic quotas of Grade "B" shippers now existing be reduced by 12½ per cent, or to 530 butterfat pounds, and assigns aggregate quotas to Grade "A" producer-distributors in the amount of 290 butterfat pounds, the quota for each producer-distributor to be calculated from the records of average daily sales in the bottle and can trade for the year 1935.

The order establishes a basic pool and a surplus pool, and provides a method of calculating the prices to be received for his product by each of the producers from each of the pools. That method is substantially as follows: There are credited into the basic pool, which is composed of all the basic quotas on the market, the actual proceeds received from the sales of fluid milk, (i. e., milk sold for human consumption) and sufficient of the actual proceeds of the surplus sales (i. e., sales in factory channels at a lower price than sales for human consumption) to make up the difference between the amount of the bottle and can sales and the total of basic averages. This total, less a small sum deducted by the board for administration expenses, is distributed through the pool at the average price received for all milk in the basic pool to each producer

on all of his production within his basic average. The proceeds of milk sold in factory channels, in excess of the total of all basic averages, is credited into the surplus pool and paid out to each producer at the average surplus price on all of his production, if any, above his basic average.

Semimonthly pooling periods were established. The first of these, from May 16 to May 31, 1936, is directly involved here. At the close of that period all producer-distributors were called on to pay equalization into both the basic pool and the surplus pool. For illustrative purposes we call attention to the statement sent by the board to the plaintiff, Bruce Fox. It shows a balance owing by him to the board in the sum of $9.86. He sold 159.30 butterfat pounds at 58½ cents, the minimum price fixed by the board. His quota was 128 pounds. As the result of the inability of some of the Grade "B" producers to sell all their production as fluid milk, the average price received for all quota milk was less than at the rate of 58½ cents per butterfat pound, and by calculation was found to be, after deducting the charge made by the board for administrative expenses, 56.22 cents. Fox was entitled to receive that price for 128 pounds, his quota. His total credit from the basic pool was, therefore, $71.96. He sold 31.30 pounds in excess of his quota, but as fluid milk, receiving therefor the minimum price for that kind of milk. The average price for which surplus milk sold was 36.31, and he was credited in the surplus pool with $11.37. The sum of his credits in both pools was $83.33. Deducting that sum from his receipts of $93.19 left the sum of $9.86, the amount the board claimed was owing by him to the equalization fund.

This and like sums, which the defendants say are owing by the plaintiffs under the law and the order,

are, according to the plaintiffs' contention, their property, of which they cannot be deprived in the manner insisted upon by the defendants without violating the due process and equal protection clauses of the Federal and State Constitutions.

■ *First.* We are not concerned with the policy of the law, its wisdom, or expediency, but only with the power of the legislature to enact it. "The court's delicate and difficult office is to ascertain and declare whether the legislation is in accordance with, or in contravention of, the provisions of the Constitution, and having done that its duty ends." *United States v. Butler*, 297 U. S. 1, 56 S. Ct. 312, 102 A. L. R. 914, 80 L. Ed. 477.

■■ That the milk industry is a legitimate subject of regulation under the police power of the state is conceded by the plaintiffs, and it is likewise conceded that the state may, by a proper and reasonable law, delegate to a board the power to fix minimum prices at which milk may be sold.

The leading case is *Nebbia v. New York*, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469. The following brief summary of the grounds of that decision, sustaining the right of a board to fix the minimum price at which milk might be sold in the state of New York, is taken from *Highland Farms Dairy v. Agnew*, 16 Fed. Supp. 575, 580:

"An act of the state Legislature was upheld which established a milk control board with power, among other things, to fix the retail prices to be charged for milk for consumption off the premises where sold. The court held that the rights of property and of contract are not absolute, and that the Fifth Amendment, in the field of federal activity, and the Fourteenth as respects state action, do not prohibit governmental regulation of private business for the public welfare, but

require only that the laws shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object to be attained; that the private character of a business does not exempt it from price regulation in the common interest, and that the New York Legislature, having found that the low price of milk in the state had led to a demoralization of the market and affected the health and prosperity of the people, the Legislature acted within the scope of its power in prescribing the regulation described.''

To this we add that the court in the Nebbia case discarded the phrase, ''affected with a public interest'', in its previous general acceptation, as the test of the state's power to regulate prices and rates. It was said, relative to the case of *Munn v. Illinois*, 94 U. S. 113, 24 L. Ed. 77, that '' 'affected with a public interest' is the equivalent of 'subject to the exercise of the police power' '', and that the phrase ''can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good''. Further, it was said that ''it is clear that there is no closed class or category of businesses affected with a public interest, and the function of the courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority, or condemn it as arbitrary or discriminatory''. In the margin (291 U. S. 526, *et seq.*) will be found elaborate notes listing the decisions in which the United States Supreme Court has held valid, as against the claim of violation of due process, laws passed for the suppresson of immorality, in the interest of health, to secure fair trade practices, to safeguard the interests of depositors of banks, regulations restricting the right of contract, prohibiting

certain kinds of business, conditioning the right to conduct a business, prescribing the terms upon which those conducting certain businesses may contract or imposing terms if they do not enter into agreements, and legislation concerning sales of goods and incidentally affecting prices, such as laws forbidding unfair competition by the charging of lower prices in one locality than those exacted in another, by giving trade inducements to purchasers, and by other forms of price discrimination. Later decisions of the Supreme Court construing and applying the New York Milk Control Act are *Borden's Farm Products, Inc., v. Baldwin*, 293 U. S. 194, 55 S. Ct. 187, 79 L. Ed. 281; *Borden's Farm Products Co. v. Ten Eyck*, 297 U. S. 251, 56 S. Ct. 453, 80 L. Ed. 669.

It is of historical interest, although without bearing on the constitutional question, that in 1937 the New York legislative assembly repealed the Milk Control law of that state. According to a writer in 46 Yale Law Journal 1359, the reasons for the repeal were the difficulties encountered in enforcing the law and the injurious consequences to local dealers from the decision of the Supreme Court in *Baldwin v. Seelig*, 294 U. S. 511, 55 S. Ct. 497, 79 L. Ed. 1032, 101 A. L. R. 55, holding that New York could not constitutionally prevent a milk dealer, who had purchased milk outside the state at a price lower than that he would have been required to pay New York producers, from bringing that milk into the state and the selling of it either in the original containers or in bottled form. It should be observed that the Joint Legislative Committee, created to investigate the Milk Control law, in addition to the reasons assigned in the Yale Law Journal, in its report recommending repeal, also pointed to improved economic conditions

and found that the emergency giving rise to the enactment of the Milk Control law no longer exists: 20 N. Y. Legislative Documents (1937) No. 81.

The principle announced by the Supreme Court in the Nebbia case was applied by this court in *State ex rel. Van Winkle v. Farmers Union Cooperative Creamery*, 160 Or. 205, 84 P. (2d) 471, in which the court sustained the power of the legislature to establish and enforce a price differential in the sales of various grades of milk and cream for factory purposes. In the following cases other state laws similar to the Milk Control Act of New York have been held valid: *State v. Newark Milk Co.*, 118 N. J. Eq. 504, 179 Atl. 116; *Albert v. Milk Control Board*, 210 Ind. 283, 200 N. E. 688; *Milk Control Board v. Crescent Creamery*, 214 Ind. 240, 14 N. E. (2d) 588; *Rohrer v. Milk Control Board*, 322 Pa. 257, 186 Atl. 336; *Reynolds v. Milk Commission*, 163 Va. 957, 179 S. E. 507; *Highland Farms Dairy v. Agnew*, 16 Fed. Supp. 575; *Colteryahn Dairy v. Milk Control Commission*, 332 Pa. 15, 1 Atl. (2d) 775; *Franklin v. State*, 232 Ala. 637, 169 So. 295; *Miami Home Milk Producers Association v. Milk Control Board*, 124 Fla. 797, 169 So. 541; *State v. Lincoln Dairy*, 221 Wis. 1, 265 N. W. 197.

Whether it be the milk industry, or any other business or calling, the power of regulation may only be put forth to correct some evil, or abuse found by the legislature to exist. The evils which the Oregon Milk Control law are intended to correct are chiefly economic ones, and substantially those which in New York and other states the legislatures deemed adequate basis for the enactment of similar legislation. They are recited in the preamble to the act, and may be summarized as the demoralization of a paramount industry result-

ing from the economic emergency and unfair, unjust and destructive economic trade practices which impair the industry in the state and the constant supply of pure, wholesome milk to its inhabitants, and constitute a menace to the health and welfare of the inhabitants of the state. There is a further declaration that the milk industry is a business affecting the public health and interest. In the absence of countervailing evidence —and there is none—these recitals must be given variety by the court, *United States v. Carolene Products Co.,* 304 U. S. 144, 58 S. Ct. 778, 82 L. Ed. 1234; *Highland Farms Dairy v. Agnew,* 16 Fed. Supp. 575, 581; *Franklin v. State,* supra; *Miami Home Milk Producers' Association v. Milk Control Board,* supra; *State v. Newark Milk Co.,* supra; *Reynolds v. Milk Commission,* supra.

■ Under the police power the "state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare and to enforce that policy by legislation adapted to its purpose", *Nebbia v. New York,* supra; and, that being so, the only question, as Chief Justice ROBERT S. BEAN said in *State v. Muller,* 48 Or. 252, 255, 85 P. 855, 120 Am. St. Rep. 805, 11 Ann. Cas. 88, is whether the regulation "has any real or substantial relation to the object sought to be accomplished, or whether it is so utterly unreasonable and extravagant as to amount to a mere arbitrary interference with the right to contract".

*Second.* We proceed to a consideration of the question whether § 13 of the act and the order made in pursuance thereof violate the due process clause of the Fourteenth Amendment. This section, it will be remembered, recites the recurrence of surpluses of fluid milk suitable for human consumption in certain mar-

kets due to seasonal fluctuations in production and other causes with the result that such surplus milk is sold for factory purposes at lower prices, and declares that in order to stabilize and promote the industry it is necessary that a uniform price be paid to all producers. It then empowers the board to define milk areas, to determine what proportion of the production of each producer shall be considered as marketed as fluid milk for human consumption and what proportion is surplus, to provide for the pooling and averaging of returns and the payment of a uniform pool price for all milk sold and produced, and to make a reasonable deduction for the board's expenses.

■ Obviously these provisions are intended as a method for determining the price which producers of milk shall receive for their product. It is a price fixing statute. Section 12 empowers the board to fix the minimum price to be charged. Section 13 declares that uniform prices shall be paid to producers and prescribes a method by which the board is to determine what those prices shall be, so that, in its essence, the question is whether the prescribed method is reasonable or arbitrary because, as Mr. Justice Roberts said in the Nebbia case: "Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

In the consideration of this question it should be borne in mind that the plaintiffs do not allege in their complaint that the price to which they are entitled from the operation of the pool is unreasonable or confiscatory, or that it is not a fair return to them for their product. They do assert, however, as we have said,

that they are entitled to the full minimum price fixed by the board and charged by the plaintiffs to their customers; that it is their property; and that to compel them to pay over any portion of it to the board for the purposes contemplated by § 13 would be to deprive them of their property without due process of law.

It should also be remembered that we are not concerned with a case involving the licensing provisions of the law and the right of a person to engage in the milk industry. This suit is brought by persons already in the market and whose right to participate in it is recognized, and nothing here said is to be taken as passing on questions that might arise in a case where one seeking to enter the industry might be denied that privilege by the board.

The purpose of the provisions of § 13 of the act is to keep the production of surplus milk within reasonable bounds, and thereby to promote and stabilize the industry through the payment of a uniform price to producers. Laws prescribing minimum prices for milk are justified by the courts on the ground, among others, that the industry is not only a basic one, which nearly concerns the economic welfare and the health of the people, but also a unique one. The public need is for a constant daily supply of pure, wholesome milk. In certain markets the demand fluctuates as does the supply. Milk is a highly perishable product which cannot be stored, but must be sold as fluid milk within a few hours after it is produced; otherwise, it is disposed of in factory channels at lower prices. As said by the court in *Rohrer v. Milk Control Board,* supra: "The supply must exceed the demand by a reasonable margin in order to provide for emergencies, and this excess over the normal demand be put to less profitable uses

and consequently paid for at a higher price.'' The report of the New York Joint Legislative Committee, which formed the basis for the Milk Control law of that state, contained the following conclusions as summarized in the opinion in the Nebbia case:

"Under the best practicable adjustment of supply to demand the industry must carry a surplus of about 20 per cent, because milk, an essential food, must be available as demanded by consumers every day in the year, and demand and supply vary from day to day and according to the season; but milk is perishable and cannot be stored. Close adjustment of supply to demand is hindered by several factors difficult to control. Thus surplus milk presents a serious problem, as the prices which can be realized for it are much less than those obtainable for milk sold for consumption in fluid form or as cream. A satisfactory stabilization of prices for fluid milk requires that the burden of surplus milk be shared equally by all producers and all distributors in the milkshed. So long as the surplus burden is unequally distributed the pressure to market surplus milk in fluid form will be a serious disturbing factor.''

The argument for a uniform price arrived at through the establishment of quotas and the pooling of returns is, that the mere fixing of minimum prices does not suffice to accomplish the desired end of a stabilized market, for as long as the incentive remains to sell all the milk possible as fluid milk, the piling up of large surpluses will continue, the surplus burden will be "unequally distributed", and "the pressure to market surplus milk in fluid form will be a serious disturbing factor". In other words, if unrestrained competition is permitted for volume of sales, at the high prices fixed by law for fluid milk, there will still be large surpluses on the market, the heavy burden of which must be borne by the less fortunate producers.

■ Whether this be true or not, we need not inquire. It is sufficient that it conceivably may be true; if so it furnishes a rational basis for the regulation. *Sproles v. Binford*, 286 U. S. 374, 52 S. Ct. 581, 76 L. Ed. 1167; *Central Lumber Co. v. South Dakota*, 226 U. S. 157, 33 S. Ct. 66, 57 L. Ed. 164; *Union Fishermen's Co. v. Shoemaker*, 98 Or. 659, 667, 193 P. 476, 194 P. 854; *Reynolds v. Milk Commission*, supra.

■ We take it that legislation, enacted primarily to promote the public interest by relieving those in the milk industry from hazards to which it is exposed in an uncontrolled market, is not open to attack by its beneficiaries unless they can show manifestly that such uniformity of price is not a legitimate means of furthering the desired and concededly lawful end of stabilizing the market, or that it is purely arbitrary or discriminatory. Doubtless, the state, or the board acting in its behalf, may not compel a producer of milk no matter in what class he falls, to accept for his product a price that is unreasonable or confiscatory. It is not claimed in this case that this is being attempted. On the other hand, while it is no part of our function either to approve or disapprove the economic policy involved, it is not difficult, once the power to regulate the price is established, to conceive a rational basis for the adoption of a system designed to prevent one producer from gaining a disproportionately large share of the fluid milk trade at the expense of another. That presupposes, of course, an interference in some degree with the right to contract, with the traditional method of unrestrained competition. But so, for that matter, does the fixing of minimum prices, which inhibits competition for low prices. From a constitutional standpoint we perceive no difference.

The board found by its order No. 107 that: "The system of pools and regulations hereinafter provided will best serve to stabilize the milk industry of the Salem milk production area and sales area, will best serve to insure to all producers in said sales and production areas a uniform return for all milk produced, will best protect the milk industry in said areas and the interests of producers, milk dealers and consumers, and insure a sufficient quantity of pure and wholesome milk in the public interest, and will and does insure a reasonable return to both producer and producer-distributor and will further insure a uniform and regular flow of milk to the sales area without affecting an unreasonable increase in the price of milk and cream to the consumer in said sales area."

Where the regulation is within the scope of authority legally delegated the presumption of the existence of facts justifying its specific exercise attaches to the orders of administrative bodies, and there is added reason for applying the presumption where, as here, the regulation challenged was adopted after notice and public hearing as the statute required. *Pacific States Box & Basket Co. v. White*, 296 U. S. 176, 56 S. Ct. 159, 80 L. Ed. 138. There is no evidence in the record to overcome this presumption; hence, we must regard the facts found by the board as established.

As stated, the law did not originally include Grade "A" producer-distributors within the provisions of § 13. Previous to the making of Order No. 107 Grade "B" producers had been assigned quotas and were subject to a pooling order. When the producer-distributors were brought in, new quotas, based on records of sales of the previous year, were allotted to both classes. This method resulted in cutting down the allotment to

Grade "B" producers (theretofore made on the basis of production) by 12½ per cent. The total of the quotas allotted represented the board's estimate, based on the experience of the producers, of the probable market for fluid milk in the area during the ensuing year, plus a small additional allowance for surplus, while to each individual was assigned his proportionate part of the whole. The order contemplates that each producer is entitled to the basic pool price for all milk sold by him up to the amount of his quota, whether actually sold as fluid milk at the minimum price or in factory channels at lower prices. This basic pool price is determined by crediting into the basic pool the proceeds of the sale of quota milk, deducting the board's expenses, and dividing the proceeds by the total number of butterfat pounds in all the quotas. Payment is then made to the producers ratably on the basis of their quotas. On the other hand, the proceeds of all milk sold in excess of the quotas is credited into the surplus pool (regardless of the price at which it may be sold), and, after deducting the board's expenses, the average price received for surplus milk is distributed to producers in accordance with the quantity of their respective surplus sales.

It results that at times, as in the case of the plaintiffs during the first pooling period from May 16 to May 31, a producer will not receive the full minimum price for his entire quota (notwithstanding that he may have sold it all as fluid milk for the minimum price) because of the inability of other producers to sell the entire amount of their quotas for human consumption. The average or basic price for all producers is thus reduced, and in the process those who have received the full minimum price must of necessity remit a por-

tion of their receipts in order that the returns may be uniform to all.

It should be observed here, as having some bearing on the reasonableness of the order, that the equalization payments required of the Grade "A" producer-distributors progressively diminished after the first pooling period and that from the middle of August, 1936, until the middle of January, 1937, during the period when they sold less than their quotas, while the Grade "B" producers oversold their quotas, the plaintiffs were not called upon to pay anything to the equalization fund.

We are of the opinion that these exactions do not constitute a taking of plaintiffs' property without due process of law in violation of the Fourteenth Amendment of the Constitution of the United States nor a taking of their property without just compensation in violation of § 18 of Art. I of the Constitution of the State of Oregon. As we have seen, the constitutional validity of price control in the milk industry makes imperative the conclusion that a uniform price may be fixed, provided the price is neither unreasonable nor confiscatory. The assessment of a producer who has actually received more for the milk he sells than the average price may be viewed in two lights, and in neither is it open to constitutional objections. It may be said, as the Indiana court held in *Milk Control Board v. Crescent Creamery*, — Ind. —, 14 N. E. (2d) 588, that the price which the producer receives (a price in all probability in excess of what he would be paid in an unregulated market) is tentative only, subject to adjustment when the average price has been determined. In that view it is not a "taking" of the producer's property within the meaning of the constitu-

tional provisions invoked. *Wallace v. Hudson-Duncan & Co.*, 98 Fed. (2d) 985. Or the assessment may be regarded as a regulatory charge justified by an "ulterior public advantage", as the Supreme Court said in sustaining the Oklahoma law for the guarantee of bank deposits in *Noble State Bank v. Haskell*, 219 U. S. 104, 31 S. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487. "It would seem", the court there declared, "that there may be other cases besides the everyday one of taxation, in which the share of each party in the benefit of a scheme of mutual protection is sufficient compensation for the correlative burden that it is compelled to assume." Analagous exercises of the powers of government, held by the courts to be free from the taint of unconstitutionality, are workmen's compensation laws, *Mountain Timber Co. v. Washington*, 243 U. S. 219, 37 S. Ct. 260, 61 L. Ed. 685, Ann. Cas. 1917D, 642; unemployment compensation laws (even though the law exacts more proportionately from those employers who afford the most regular work to their employees and have the least employment), *Howes Bros. v. Massachusetts*, — Mass. —, 5 N. E. (2d) 720, petition for writ of certiorori denied, 300 U. S. 657, 81 L. Ed. 867, 57 S. Ct. 434; and laws assessing owners of dogs to provide a fund out of which a sheep owner whose sheep may be killed by dogs is indemnified. *Morey v. Brown*, 42 N. H. 373; *Tenney v. Lenz*, 16 Wis. 589; *Mitchell v. Williams*, 27 Ind. 62.

A law similar to the one here under attack, providing for quotas and pools in the milk industry, and an order made pursuant thereto, were sustained in *Milk Control Board v. Crescent Dairy*, supra. In *Wallace v. Hudson-Duncan & Co.*, supra, an order of the Secretary of Agriculture given under the Agricultural Ad-

justment Act was assailed as a taking of property without due process of law and without just compensation in violation of the Fifth Amendment of the Federal Constitution. The order was designed to create a parity of the price of unshelled walnuts with nonagricultural commodities by diminishing the supply in the consuming markets with a subsequent price rise. The economic evils said to justify the regulation were similar to those affecting the milk industry, and the order, held to be authorized by the act, was, in effect, one for the control of surplus through the allotment of quotas to packers of walnuts who were required either to sell or hold all the walnuts acquired by them in the state of acquisition, or to export not more than a certain percentage, delivering the remainder to a control board which was empowered to sell them at prices fixed by it or to eliminate them from the market by donations or sales to charitable institutions in the United States. Proceeds of the sale of the surplus and the payments of so-called "credit values" by the shippers were to be ratably apportioned and distributed to the shippers by the board. As an alternative a packer might export all his intended shipments from the state upon the consideration of a payment to the board, not of what the packer had sold them for but of a certain "credit value", fixed for all shippers by the board, of the surplus walnuts which otherwise would have been delivered to the board. The order was sustained as a valid exercise of the commerce power of the Congress. The regulation was said to be "for immediate and direct private benefit, but also for a justifying public purpose found by Congress. It has compensatory benefits to a large group of individuals by restoring the lack of parity in price for their products declared by the Con-

gress and held by us to have an evil effect on the country as a whole.'' There was no contention that the order was unreasonable, and hence no violation of the due process clause of the Fifth Amendment was found, the court holding that the regulation was a valid exercise of the police power of the Congress incident to regulating interstate commerce, and citing as authority, *inter alia*, the Nebbia case. ''Price fixing'', it was said, ''when employed by Congress, as well as when employed by the state legislatures, is gauged by the same standards as other regulation in the exercise of governmental powers, namely, the standards of reasonableness.

Another recent decision construing legislation embodying the same sort of economic policy is that of *Agricultural Prorate Commission v. Superior Court*, 5 Cal. (2d) 550, 55 P. (2d) 495. The law under consideration regulates the marketing of lemons in California. A commission was given power to establish quotas and to prohibit lemon growers from marketing any portion of their crops in excess of their respective quotas. The act was sustained as a legitimate exercise of the police power and not in violation of the due process clauses of state and federal constitutions, nor of those sections which provide against the taking of private property for public use. The industry was found to be one of the most important in the state, and the court, relying largely on the decision in the Nebbia case, said:

''If the state has the authority to fix the price at which a commodity such as milk may be sold and thus avoid the ruinous effect of unrestrained competition, as we understand the decisions of the highest court in this land so held, we can see no difference in principle in a state statute which attempts to regulate the pro-

duction and marketing of a commodity, where without such regulation the industry would be practically destroyed to the great detriment not only of those engaged therein, but to the state and its citizens as well * * * We do not feel that we are in any way or to any extent extending the principles of law enunciated in the authorities cited above by holding that such a business is so affected with a public interest or clothed with a public use as to justify the state in the exercise of its police power to impose such reasonable regulations upon the quantity of the commodity that may be produced and marketed therein as will save the industry from destruction from ruthless competition, the direct effect of overproduction."

In *Mulford v. Smith*, 59 S. Ct. 648, 83 L. Ed. 628, decided April 17, 1939, the Supreme Court sustained a provision of the Agricultural Adjustment Act of 1938 regulating the marketing of flue-cured tobacco by allotting quotas fixed by the Secretary of Agriculture to the states and to individual farmers therein, and providing that if tobacco in excess of the quota for the farm on which the tobacco is produced is marketed through a warehouseman, the latter must pay to the Secretary a penalty equal to 50 per cent of the market price of the excess, and may deduct an amount equivalent to the penalty from the price paid the producer. The plaintiffs, producers, sued the defendants, warehousemen, to restrain the latter from deducting penalties in the amount of $374,000 on account of sales in excess of quotas allotted for the 1938 crop. The declared basis of the legislation was the necessity of stabilizing a basic national industry by preventing the marketing of excessive supplies. The law was held to be valid as a regulation of commerce, and the court rejected a claim of violation of the due process clause of the Fifth Amendment asserted on the sole ground that

the quotas were assigned after the plaintiffs had incurred the expense of planting and cultivating their crops, and that therefore the law was retroactive in its operation. The court held that the law regulated marketing—not production—and the growers knew what their quotas were before the crops were marketed. "The act", it was said, "did not prevent any producer from holding over the excess tobacco produced, or processing and storing it for a later year."[*]

The plaintiffs rely on the case of *Beck v. Patterson*, 21 Fed. (2d) 72. In that case a three-judge court, sitting as the District Court of the United States for the District of Oregon, held invalid an act of the legislature which provided that the governor shall, at the request of the Cattle and Horse Raisers Association of Oregon, appoint a stock inspector or inspectors for any stockyard or yards in the state for the purpose of inspecting all horses and cattle coming to said yards, the compensation of such inspectors to be agreed upon and paid by the association. The inspection charges were to be paid by the owners of the stock to the inspectors, and by them paid over to the association, which was to pay all costs and expenses of all brand inspections provided by law, first, however, paying in to the state treasurer's office five per cent of the fees so collected. It appeared that if the inspectors were permitted to collect the fees they would amount to approximately $75,000, while the costs and expenses of inspection

---

[*] On June 5, 1939, one day before this decision was rendered, the Supreme Court of the United States, in The United States v. Rock Royal Co-operative, Inc., and companion cases, not yet officially reported, sustained the validity of an order of the Secretary of Agriculture issued under the Agricultural Marketing Agreement Act of 1937 regulating the handling of milk in the New York metropolitan area. The decision holds valid a provision of the regulation fixing uniform prices arrived at through an equalization pool. See, also, H. P. Hood & Sons, Inc., v. The United States, decided the same day.

would not exceed $4,000, and the surplus was intended to be used by the association in publishing and distributing information to its various members relating to the marketing of livestock and the payment of expenses incident thereto. We think the case is plainly distinguishable. While it was competent for the state to enact reasonable inspection laws the state could not, as the court, speaking through Judge ROBERT S. BEAN, said, "under the guise of an inspection law lawfully exact a fee to be paid by the owners of stock inspected for the benefit of an association of individuals not a public agency or controlled or managed by the state". The payment of a sum in excess of $70,000 for the benefit of private individuals, to be used for their own private purposes, was manifestly irrelevant to the attainment of any end within the police power of the state. It was "but an attempt under legislative form to take the property of one citizen and transfer it to the use and benefit of another". The law, unlike the Milk Control Act, was not intended to accomplish any public purpose.

■ *Third.* The plaintiffs' insistence that the law and the order made in pursuance thereof deny to them the equal protection of the laws in violation of the Fourteenth Amendment of the Federal Constitution and of Art. I, § 20, of the Oregon Constitution, rests upon two grounds. First, that Grade "A" milk is superior to and costs more to produce than Grade "B" pasteurized milk. Second, that Grade "A" producer-distributors do not themselves produce more milk than they are able to sell for human consumption, and therefore it is arbitrary to compel them to contribute to an equalization fund on account of a surplus which is not of their making.

The plaintiffs, in our opinion, have failed to sustain the burden of proof that their product is superior to that of the Grade "B" producers. Due to the fact that Grade "A" milk is sold for human consumption without pasteurization some sanitary precautions must be taken in its production that are not demanded of the Grade "B" producers. Under the terms of the Salem milk ordinance Grade "A" raw milk must have a much lower bacterial count than Grade "B" milk before pasteurization. After pasteurization the requirements are identical. The pasteurization process, by destroying the pathogenic or disease-producing bacteria, constitutes a safeguard to the public health from infectious diseases, while whatever loss in nutritive value may result is negligible. There is some evidence to the contrary, but to our mind it is not convincing. For several years past, and both before and since the adoption of the Milk Control Act, the two products have been sold to the public on the Salem market for the same price. One of the plaintiffs conceded on the witness stand that "people have changed because doctors have recommended pasteurized milk and now we have to pasteurize to satisfy the trade." The whole question seems to be a matter of opinion and of individual preference. In that condition of the evidence the court cannot substitute its judgment for that of the legislature and pronounce the legislative decision unwarranted and without any rational basis.

As to the cost of production, the plaintiffs proved the amount of their investments in land, cattle and equipment, but made no attempt to show that these were in excess of the investments of Grade "B" producers of dairies of like size and productive capacity. While it is no doubt true that the observance of sani-

tary regulations required of the plaintiffs by the standard ordinance but not of the Grade "B" producers, involves an expense not incurred by the latter, it is also true that the pasteurization of Grade "B" milk involves an expense from which the plaintiffs are free; and, for all that appears, the one expense may offset the other.

A clear understanding of the surplus problem makes it necessary to reject the plaintiffs' contention that they should be exempt from a regulation which finds its justification largely in the existence of that problem. Surplus in the milk industry has two aspects. In one, it is common to many industries—the everyday phenomenon of undesired and involuntary over-production resulting in depressed values. In the other, it is peculiar to the production and marketing of milk—something intentional and unavoidable and necessary if the public needs are to be satisfied.

The Grade "A" producer-distributors neither carry this intentional surplus, which might perhaps be characterized as a margin of safety or insurance for the public, nor do they, in any substantial degree, find themselves from time to time burdened with a large surplus as the result of seasonal fluctuations in demand and supply. But they are not for those reasons, in our opinion, dissociated from the surplus problem. They supply 40 per cent of all the milk sold in the Salem area. When the market is viewed as a whole, therefore, it cannot be said that they do not contribute materially to the problem of involuntary surplus. On the other hand, they escape the financial risk and expense incident to the maintenance of a reserve in a vital food product for the benefit of the public. When they find themselves without sufficient product to supply the

demands of their own customers they replenish their supplies by purchases from their competitors, the Grade "B" producers. Thus, the evidence here shows that in the period from May 16 to December 31, 1936, the plaintiffs, being undersupplied, purchased 28940 butterfat pounds of Grade "B" milk, approximately 27 per cent of their entire sales, and in September and October of that year, the lean season when milk is costly to produce, they purchased 32 to 35 per cent of their total sales from the Grade "B" group.

The Fourteenth Amendment to the Federal Constitution prohibits a state from denying "to any person within its jurisdiction the equal protection of the laws", while § 20, of Art. I, of the State Constitution, provides "No law shall be passed granting to any citizen or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." "The provisions of the State Constitution are the antithesis of the Fourteenth Amendment in that they prevent the enlargement of the rights of some in discrimination against the rights of others, while the Fourteenth Amendment prevents the curtailment of rights." *State v. Savage,* 96 Or. 53, 59, 184 P. 567, 189 P. 427. According to the same authority, the tests as to both provisions are the same.

These provisions are most frequently invoked in cases where it is claimed that in subjecting persons to more or less burdensome regulations the legislature has omitted other persons who, in reason and fairness, should be included. But, of course, it is equally obnoxious to their guaranties to bring within the operation of a law persons to whom, in reason and fairness, it ought not to be applied. In other words, there must be a reasonable basis for the classification. Legisla-

tion, which affects alike all persons pursuing the same business under the same conditions, is not such class legislation as is prohibited. *State v. Kincaid*, 133 Or. 95, 105, 285 P. 1105, 288 P. 1015; *Wright v. Wimberly*, 94 Or. 1, 12, 184 P. 740, 12 Am. Jur. 186, § 504. See *State v. Muller*, 48 Or. 252, 258, 85 P. 855, 120 Am. St. Rep. 805, 11 Ann. Cas. 88. The guarantee of equal protection of the laws admits of the exercise of a wide scope of discretion and avoids only what is done without any reasonable basis, and therefore is purely arbitrary. *Motlow v. State*, 125 Tenn. 547, 145 S. W. 177, L. R. A. 1916F, 177. The classification is not arbitrary if any state of facts reasonably can be conceived that would sustain it, and the existence of that state of facts at the time the law was enacted must be assumed. *Rast v. Van Deman and Lewis Co.*, 240 U. S. 342, 36 S. Ct. 370, 60 L. Ed. 679, Ann. Cas. 1917B, 455, L. R. A. 1917A, 421. "Moreover, it is well settled that a classification having some reasonable basis does not offend against the Federal Constitution merely because it is not made with mathematical nicety or because in practice it results in some inequality." 12 Am. Jur. 158, § 483. "The Fourteenth Amendment", said Mr. Justice Holmes in *Dominion Hotel Co. v. Arizona*, 249 U. S. 265, 63 L. Ed. 597, 39 S. Ct. 273, "is not a pedagogical requirement of the impracticable". Finally, as stated by Mr. Justice Roberts in *Borden's Company v. Ten Eyck*, supra, "judicial inquiry does not concern itself with the accuracy of the legislative finding, but only with the question whether it so lacks any reasonable basis as to be arbitrary."

■ In view of the facts found in the record before us, which have been briefly summarized, it is idle to contend that the legislature acted arbitrarily and without

reasonable basis in applying the provisions of § 13 of the Milk Control law to the plaintiffs as well as to producers of Grade "B" milk. Both groups are engaged in the business of producing milk for consumption by the public. They are in competition with each other. As to the controversial issues made respecting investments, costs of production, and the relation of the plaintiffs to the surplus problem, the court need go no further than to yield to the judgment of the legislature on what are at best debatable questions.

The provisions of the order for the establishment of quotas and the ascertainment and payment of a uniform price through the pooling of returns operate uniformly on all alike. They apply to the plaintiffs only in their capacity of producers. The revenues they receive as dealers are not affected. There may not be precise uniformity in results, but that does not spell discrimination in the constitutional sense. *Cotting v. Kansas City Stock Yards Co.*, 183 U. S. 79, 110, 22 S. Ct. 30, 46 L. Ed. 92; *Merchants' & Manufacturers' National Bank v. Pennsylvania*, 167 U. S. 461, 463, 17 S. Ct. 829, 42 L. Ed. 236. All who are governed by these regulations, the plaintiffs as well as Grade "B" producers, are beneficiaries of the minimum price provisions of the law, intended to be, and which no doubt are, an aid to the industry and to those who are engaged in it.

The case of *Yick Wo v. Hopkins*, 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220, 227, is cited by the plaintiffs. To the opinion in this celebrated case itself may well be applied some of its own language. It is one of "the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws". But we think it is

not in point. It decides that certain city ordinances, which invested arbitrary authority in the board of supervisors of the City of San Francisco to grant or withhold the right to operate laundries in wooden buildings, and which in their actual operation were directed exclusively against Chinese subjects, denied to such persons the equal protection of the laws. We are able to see no analogy in the facts to the instant case, nor that the provisions of the Milk Control Act are being enforced "with an evil eye and an unequal hand". On the contrary, the assessments or equalization fees required to be paid by the plaintiffs are determined according to a uniform rule, which applies to every producer of milk in the Salem area, and there is no evidence that the board has discriminated against the plaintiffs.

*Fourth.* It remains to consider whether the act confers legislative power on the board in violation of § 1, Art. IV, and § 21, Art. I, of the Oregon Constitution. It is asserted the legislature has failed to prescribe a rule of law or fix a standard or guide by which the actions of the board in administering the law are to be governed and to which they must conform, and therefore that the act falls within the condemnation of such decisions as *Van Winkle v. Fred Meyer, Inc.*, 151 Or. 455, 466, 49 P. (2d) 1140; *Portland v. Welch*, 154 Or. 286, 303-304, 59 P. (2d) 228; *Panama Refining Co. v. Ryan*, 293 U. S. 388, 421, 55 S. Ct. 241, 79 L. Ed. 446, 459; *Schechter Poultry Corp. v. United States*, 295 U. S. 495, 529, 55 S. Ct. 837, 79 L. Ed. 1570, 1580; *Ferretti v. Jackson*, 88 N. H. 296, 188 Atl. 474, 478; and *State v. Hines*, 94 Or. 607, 186 P. 420.

The particulars in which authority is said to be granted without rule or standard for its exercise are

these: (1) To limit and define the geographical area from which fluid milk shall be produced for any given market; (2) To determine, under uniform rules and regulations, what portion of the milk produced by a producer shall be considered as marketed as fluid milk for human consumption and what portion as surplus. (3) To provide for the pooling and averaging of returns and the payment of a uniform pool price to producers, subject to such rules and regulations as may be imposed for the control of surplus production by the establishment of basic averages or other methods. (4) To make any other or further order, rule or regulation, and exercise such further power as may be deemed necessary by the board for the accomplishment of the aforesaid objects.

■ The principle governing this subject is thus stated in the oft-quoted language of Mr. Justice Agnew in *Locke's Appeal*, 72 Pa. 491, 13 Am. Rep. 716, cited with approval by this court in *Van Winkle v. Fred Meyer, Inc.*, 151 Or. 455, 462, 49 P. (2d) 1140:

"Then, the true distinction, I conceive, is this: The legislature can not delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the law making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation."

The constitution does not deny to the legislature "the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subor-

dinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature shall apply," *Schechter Poultry Corp. v. United States*, supra; *Panama Refining Co. v. Ryan*, supra; *Livesay v. DeArmond*, 131 Or. 563, 284 P. 166, 68 A. L. R. 422, and Oregon cases there cited.

■ It is only necessary that the statute establish a sufficient basic standard and a definite and certain policy and rule of action for the guidance of the agency created to administer the law. *State v. Newark Milk Co.*, supra.

We deem it unnecessary to elaborate upon a subject which has been treated so fully in the United States Supreme Court cases which we have cited, as well as by this court in *Livesay v. DeArmond*, supra; *Van Winkle v. Fred Meyer, Inc.*, supra; *Stettler v. O'Hara*, 69 Or. 519, 139 P. 743; *State v. Corvallis and Eastern R. Co.*, 59 Or. 450, 117 P. 980; and *Moore v. Packwood*, 5 Or. 325. For an exhaustive annotation of the subject, see 79 L. Ed. 474.

The preamble to § 13 recites that the surplus milk evil exists in certain markets and that to stabilize and promote the milk industry it is necessary that uniform prices be paid to all producers who furnish milk to any specified market. Hence, the board, in designating the market area, must first find that the evil referred to exists, and must define its boundaries by reference to the producers who supply milk to the particular market. The law clearly contemplates the establishment of a natural marketing area. The standard would be violated, for example, if a portion of Tillamook county were included in the Salem market area.

In determining what portion of milk produced shall be considered as marketed as fluid milk, several pri-

mary standards must be observed by the board. They must act under uniform rules and regulations, thus assuring equality of treatment to all. Under § 12, in fixing minimum prices, the board shall take into consideration "the price necessary to produce a reasonable return to the producer". An allotment of a quota which would result in an unreasonable return to a producer would be a violation of this standard.

"Pooling" and "averaging" are words of common use, and their significance is commonly known. The requirement that a uniform pool price be paid obviously means that each producer shall receive the same price for the same class of milk, as fixed by the board. The criticism that the expression "basic average" is not defined in the statute is without merit, because, as the testimony in the case indicates, it has a well-known meaning in the milk industry and is a device which has been developed in cooperative effort to meet the evil of uncontrolled surplus. A discussion of the subject may be found in House Documents, 74th Congress, 2d Session, "Sale and Distribution of Milk and Milk Products", pp. 1 et seq. The authority given by the board to establish basic averages carries with it a limitation of the board's power to determine quotas, and that is that a quota must be based on the producer's fair share of the market, as determined by previous experience. The legislature was not required, however, in order to avoid abdicating its constitutional functions, to prescribe in detail the length of the experience to be considered, or whether it should be the experience of production or sales. It could constitutionally leave such matters to the discretion of the administrative body which it created. *Livesay v. DeArmond*, supra.

As to the authority to "make any other and further order, rule or regulation and exercise any such

further power that may be deemed necessary by the board for the full accomplishment of the aforesaid objects", it is enough to say, as the court said upon a similar question in *Highland Farms Dairy v. Agnew*, supra, that "no attempt has been made to exercise the powers so described, and we have no occasion to decide whether they may ever be lawfully exercised".

■ We think that the legislature has not given the Milk Control Board "unfettered discretion", as the Supreme Court describes it in the Schechter case, but on the contrary that it has hedged about the board's authority with definite restrictions, which must be observed or its action is unlawful. The standards set up, in our opinion, are legally sufficient and the legislature has not delegated its power to make law, but has only conferred upon the board authority to make administrative rules (*United States v. Grimaud*, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563) in carrying out the legislative policy. This conclusion is supported by the following cases: *State v. Corvallis and Eastern R. Co.*, supra; *Stettler v. O'Hara*, supra; *Livesay v. DeArmond*, supra; *State v. Briggs*, 45 Or. 366, 77 P. 750, 78 P. 361, 2 Ann. Cas. 424; *United States v. Grimaud*, supra; *Hampton Jr. & Co. v. United States*, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624; *Buttfield v. Stranahan*, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525; *Union Bridge Co. v. United States*, 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; *Federal Radio Commission v. Nelson Bros.*, 289 U. S. 266, 53 S. Ct. 627, 77 L. Ed. 1166, 89 A. L. R. 406; *Rohrer v. Milk Control Board*, supra; *Albert v. Milk Control Board*, supra; *State v. Newark*, supra.

We will briefly point out the distinction between this case and the attempted delegations of authority

held unlawful in the cases relied on by the plaintiffs. In *Panama Refining Co. v. Ryan,* supra, was involved a provision of the National Industrial Recovery Act, by which the President was authorized "to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage by any state law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a state." The act was held invalid because it declared no legislative policy, but left to the states the determination of what production of petroleum and petroleum products should be permitted, and to the President "an unlimited authority to lay down the prohibition, or not to lay it down, as he shall see fit." (In *Schechter v. United States,* supra, another section of the National Industrial Recovery Act was held invalid which authorized the President to approve "codes of fair competition" for a trade or industry, which codes would then have the force and effect of law. No standards were set up save the statement of the general aim of rehabilitation, correction and development of trades and industries. In *Van Winkle v. Fred Meyer, Inc.,* supra, an act of the Oregon legislature providing for the making of marketing agreements which should become the legal standards of fair competition and fair trade practices for industry covered by the agreement was condemned, because it delegated to a preponderant majority in the industry the authority to prescribe the terms of such agreement—to fix the price of any commodity covered by the agreement and limit and restrict the amount which may be produced and sold and prescribed no rule, standard or guide by which the exercise of such powers was to be governed. In

*Portland v. Welch,* supra, this court declared unconstitutional the Tax Supervising and Commerce Commission Act on the ground, among others, that the only standard fixed was that contained in the oath of the commissioners to endeavor to secure "an efficient and economical administration of government in the county." This was said to be "not susceptible of definition." In *Ferretti v. Jackson,* supra, a milk control law was considered which conferred upon a board the power to fix minimum prices, but only upon application of at least fifty consumers in any market or of a producers' and distributors' co-operative association supplying a substantial proportion of the milk consumed in such market, or of producers or distributors or both supplying such proportion if there is no such association. Because of the vague and uncertain nature of the evils to be corrected, as set forth in the preamble of the act, it was held that no sufficient guide or standard of conduct had been prescribed. The court said:

"Whatever the board might deem to be unfair it might pronounce to be illegal. The act directs compliance with the board's orders, and its correction of practices found by it to be unfair requires their abandonment, with the act penalizing disobedience. For occasion found by it, the board might fix minimum prices. In brief, it was vested with power to do what it thought expedient in the suppression of methods of business it might consider harmful. The need and occasion for action as well as the action were all placed in the board's discretion."

We conclude that the contention that there has been an unlawful delegation of legislative authority is not well founded.

■ It is further asserted by plaintiffs that § 4 of the act is invalid in that it provides: "The board may, by official order, exempt from the license requirements provided by this act, milk dealers selling milk in any quantities in markets of 15,000 population or less." The complaint contains no specific attack on this section, nor on any of the licensing provisions of the law. On the contrary, the plaintiffs expressly aver that they are duly licensed and have paid the poundage fees required by Ch. 67, Oregon Laws Special Session 1935. Under these circumstances, we are not called upon to determine the question attempted to be raised. 11 Am. Jur. 767, § 123; 774, § 126.

*Miscellaneous Assignments.*

■ Complaint is made that the board, in disregard of the terms of Order No. 107, assessed the plaintiffs on account of what is referred to in the record as "surplus in quota", whereas the order only authorizes such assessments for "surplus above quota". But the latter, as we understand it, are meant assessments made on account of sales in excess of quotas at the fluid milk price, and which are paid into the surplus pool to equalize the price at which the entire quantity of milk in excess of quotas is sold. In § 18 of the order these payments are specifically required of producer-distributors. There are other sections of the order, however, which, as we read them, apply to both Grade "A" producer-distributors and to Grade "B" producers, and provide for the payment of equalization on account of so-called "surplus in quota". Thus, in § 15 it is provided:

"There is hereby established as to *all milk and/or cream* produced for sale or offered for sale in the sales area two pools, to wit: a basic pool and a surplus pool,

such pools and the prices to be received by each of said producers to be calculated as follows". (Emphasis supplied).

Then follow provision, which have been previously summarized, for crediting into the basic pool (a) the proceeds of sales for use in the bottle and can trade and (b) the proceeds of sales of the quantity of milk and cream by which the total of all quotas on the market exceeds the total volume of bottle and can sales on the market at the surplus pool price. It is provided that "in no event shall the basic pool payment price exceed the basic price to dealers as established by the board;" and that "the proportion of surplus sales by which the total of all quotas exceeds the bottle and can requirements shall be accounted for * * * to the basic pool at prices established under the Rules and Regulations of the Board for each pooling period to be known as 'Surplus Price' ".

These provisions apply alike to all producers, of whatever class. Read together, we think they mean that where the full quantity of all the basic averages are not sold at the fluid milk price, the basic pool price shall be the average price obtained from the sum of the proceeds of all milk sold at the price fixed for fluid milk plus the proceeds of all other milk sold up to the amount of the total of basic averages at the surplus price. This average price will, of course, be less than the minimum price for fluid milk, and, consequently, in order that all producers may receive the uniform average price, a certain proportion of the proceeds of those who have sold their entire quotas as fluid milk must be remitted to the fund for purposes of equalization. The "surplus within the quota", as we understand it, is that quantity of milk less than the amount

of the quotas which has been sold, but not as fluid milk; and the equalization which must be paid on that account is required, we think, under the terms of the order, of producer-distributors as well as Grade "B" producers.

The plaintiffs further assert that, owing to the increase in the population of Salem and consequent increased demand for their product, the quotas assigned to them are inadequate. This is not an attack on the constitutionality of the law, but, at the most, an accusation of improper administration by the board. The evidence shows, however, that none of the plaintiffs have ever applied to the board for a correction or modification of the order. Section 12 of the Milk Control Act provides: "The board may on its own motion or upon application, from time to time alter, revise or amend any order theretofore made with respect to prices to be charged or paid for milk, designating and defining the limits of markets, milksheds, or upon any other matter within the jurisdiction of the board." The plaintiffs, as far as this question is concerned, should have utilized this administrative remedy before resorting to suit. *Hegeman Farms Corporation v. Baldwin,* 293 U. S. 163, 55 S. Ct. 7, 79 L. Ed. 259, 263; *Rohrer v. Milk Control Board,* supra; *Highland Farms Dairy v. Agnew,* supra. See *Lee, Inc., v. Pacific Telephone & Telegraph Co.,* 154 Or. 272, 276, 59 P. (2d) 683.

■ There is also criticism of the defendants because of a change made in the calculations of the assessments. The evidence shows the following state of facts: The pooling periods are for 15 days each. In order to make accurate calculations it is necessary that the board have exact data as to the sales made during a particular pooling period. A number of the producer-distributors failed to report their sales for the first

pooling period from May 16 to May 31, 1936, and in consequence the board's original calculations were based on actual sales made by those who had reported, and as to the others on the assumption that they had sold the amount of their quotas. Afterwards, apparently for the purposes of trial, and in order, as the defendants say, to achieve uniformity, the pools were re-calculated on the assumption that all the producer-distributors had sold their entire quotas. In this process the assessment of Bruce Fox, for example, was reduced from $9.86 to $2.12. It is not clear to us how this second calculation would achieve uniformity since it is not based on the actual sales of those who did report, and most of whom sold in excess of their quotas. We think, however, that the matter is not very important since the board does not claim that the amount of equalization found in the second calculation represents a legal liability of the plaintiffs. There can be no such liability that is not ascertained by following with precision the method prescribed in the order and using the figures of actual sales, which, apparently, must be obtained from the plaintiffs themselves. The poundage reports, which all producers are required to make monthly, show the amount of the sales each month, but, as they are not segregated according to the pooling periods, they can only be used to bring approximate results. At the time the case was begun in the circuit court a temporary injunction was issued enjoining the defendants from enforcing the order as to the plaintiffs and continued in effect until the decree nearly two years later. In the meantime some of the producer-distributors appear to have reported for a few months, and after that none of them made any reports. We

assume that until all shall have reported it will not be possible to make completely accurate calculations. So far as we are able to determine, nothing done by the board in the matter of these revised calculations was arbitrary, oppressive or illegal. It cannot affect the issue for decision.

Our conclusion, after a careful consideration of all the contentions urged by the plaintiffs, is that the Milk Control law is not unconstitutional in any of the particulars asserted, and that it has not been shown that the board has acted arbitrarily or in violation of the terms of Order No. 107. It results that the decree of the circuit court must be affirmed, and it is so ordered. No costs or disbursements will be allowed.

KELLY, BELT and BAILEY, JJ., concur.

---

RAND, C. J. (dissenting). It seems to me that the only question necessary for decision in this case is whether the state or an agency of the state can lawfully take away from one class of persons who produce and sell the highest grade of milk, which is conceded to be Grade "A" raw milk, a part of the moneys received from the sale thereof and, without their consent, pay the moneys or any part thereof to another class of persons who produce and sell, for a less price, milk of an inferior grade or quality which, under existing law, cannot be marketed until pasteurized.

This is precisely what the plaintiffs in this case are complaining of and for which they are now seeking injunctive relief.

Article I, section 18, of the constitution of this state, provides that:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; * * *".

In *Beck v. Patterson*, 21 F. (2d) 72, District Judge Bean, a former member of this court, said:

"It is a fundamental principle of our government that no man shall be involuntarily deprived of his property, except for a public purpose, and therefore a legislative act which takes or undertakes to authorize the taking of one person's property for the benefit of another is not a law, but an arbitrary decree whereby the property of one citizen may be transferred to another, and is beyond the power of the legislature. (Citing authorities.) 'To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favorite individuals, to aid private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law.' "

It has always been conceded by the bench and bar of this state that private property, under our constitution, cannot be taken for a private use and that the legislature has no power to enact any legislation authorizing that to be done. Yet that is the very thing against which the plaintiffs now complain, and it is being done under the supposed authority of the Milk Control Board acting as an agency of the state. This action upon the part of the board, in my opinion, is not a proper exercise of the police power and cannot be sustained without violating the constitution of this state. This, I think, renders unnecessary any consideration by the court at this time of the validity of the

Milk Control Act, or any of its provisions, except in respect to the matter above stated.

For these reasons, the decree of the lower court should be reversed and a decree should be entered granting to the plaintiffs the injunctive relief prayed for in their complaint.

BEAN and ROSSMAN, JJ., concur.