Argued February 7, affirmed June 27, 1951

# SAFEWAY STORES, Inc. *v.* OHLSEN
## 233 P. 2d 778

[1]

*Herbert C. Hardy,* of Portland, argued the cause for respondent. With him on the brief were Denton G. Burdick, Jr., and Cake, Jaureguy & Tooze, all of Portland.

*Samuel B. Weinstein,* Special Assistant Attorney General, of Portland, argued the cause for appellant.

With him on the brief was George Neuner, Attorney General, of Salem.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LUSK and WARNER, Justices.

ROSSMAN, J.

This is an appeal by Thomas L. Ohlsen, Milk Marketing Administrator [Oregon Laws 1949, Chap. 547, § 1], from a decree of the Circuit Court which, after holding that an order entitled G. O. No. 117 entered by the defendant's predecessor, the Director of Agriculture, August 3, 1948, was invalid, enjoined the defendant from enforcing it.

The defendant's single Assignment of error reads:

"The lower court erred in entering its decree that Official Order No. 117 was beyond the Director's authority, and further erred in enjoining the enforcement of said order with respect to the extent and scope of the Portland Sales Area."

July 30, 1948, the defendant's precedessor promulgated Order G. O. No. 116 to be effective August 1, 1948. It materially enlarged the Portland milk marketing area as it was constituted by an order bearing No. 40 promulgated August 4, 1945. The power to issue the orders was conferred by Oregon Laws 1933 [2d S.S.], Chapter 72, together with its amendments. The entire enactment is known as the Milk Control Act. Order No. 116 included in the Portland marketing area not only all of the region described in Order No. 40, but also parts of Washington, Clackamas and Columbia Counties, together with segments of Multnomah County which were unmentioned in No. 40, Order No. 117, which, as we have stated, was issued

August 3, 1948, described the same area as No. 116, with the exception of the part of Columbia County. The part just mentioned included the city of St. Helens. Before No. 116 was entered, notice was given and a hearing was held, but No. 117 was not preceded by any notice or hearing. The defendant contends that No. 116, through inadvertence, added to the Portland marketing area the part of Columbia County which is mentioned in that order, and that No. 117 was issued to correct the purported error. According to him, the error was a clerical one made in the process of drafting the order, and Order 117 did nothing more than make No. 116 express the actual judgment of the director. The plaintiff, which operates food stores in Portland and St. Helens, denies that Order No. 116, through mistake, included in the Portland marketing area the part of Columbia County mentioned in that order. It also contends that if a mistake actually was made it was not clerical. Further, it claims that since the promulgation of Order 117 was not preceded by notice and a hearing, the order is invalid.

The Milk Control Act [§§ 34-1001 to and including 34-1018, O.C.L.A., as amended by Oregon Laws 1943, Chap. 120, and Oregon Laws 1949, Chap. 547] creates an agency charged with the duty of regulating the price, production and marketing of milk. Sections 34-1001 to and including 34-1018, in their unamended form, are analyzed in *Savage v. Martin,* 161 Or. 660, 91 P. 2d 273, which sustained the validity of the enactment.

Oregon Laws 1943, Chapter 120, repealed § 34-1002 which had created a milk control board entrusted with the powers enumerated in the enactment. The 1943 statute declared:

"* * * all provisions of the law heretofore administered by the milk control board * * * shall be administered by the state department of agriculture under the direction and control of the director of agriculture."

Mr. E. L. Peterson, the original defendant in this suit, was the Director of Agriculture when Orders 116 and 117 were issued. At that time Mr. Ohlsen, the present defendant-appellant, was Mr. Peterson's subordinate and was in charge of the administration of the Milk Control Act. Oregon Laws 1949, Chapter 547, provided that the powers conferred by the Milk Control Act should thereafter "be administered under the direction and control of an executive officer known as the milk marketing administrator." We shall hereafter term that official the administrator. After the enactment of the 1949 act, Mr. Ohlsen was appointed administrator. Still later he was substituted as defendant and appellant in this suit. In quoting sections of the act we shall, in order to facilitate convenience, substitute the word "administrator" for the word "board" wherever the latter occurs in the act.

Section 34-1009, O.C.L.A., confers upon the administrator authority to "define what shall constitute a natural market area and define and fix the limits of the milkshed or territorial area within which milk shall be produced to supply any such marketing area; * * *." Section 34-1013 bestows powers ancillary to the one just noted. Order 116 was issued pursuant to the powers conferred by those sections of the Milk Control Act.

■ Section 34-1012, O.C.L.A., after authorizing the administrator to conduct investigations, says:

"After making such investigation the adminis-

trator shall, by order, fix the minimum wholesale and retail prices to be charged for milk handled and sold within the state for human consumption * * *.

      *          *          *          *          *

"After the administrator shall have fixed the prices to be paid to the producer or association, and the prices at which milk shall be sold as provided in the preceding paragraph hereof, it shall be unlawful to buy or offer to buy, sell or offer to sell, any milk at prices other than the prices fixed by order of the administrator; * * *.

"The administrator may on its own motion or upon application, from time to time alter, revise or amend any order theretofore made with respect to prices to be charged or paid for milk, designating and defining the limits of markets, milksheds, or upon any other matter within the jurisdiction of the administrator. After making any such investigation and before making, revising and amending any such order, the administrator shall give notice to interested parties and the public generally of the time and place of hearing thereon, * * *."

It is seen from the parts of the act just quoted that it confers power upon the official charged with its administration to constitute, by orders issued by him, milk marketing areas, and also power to "alter, revise or amend" such orders. The defendant freely concedes that an order constituting a milk marketing area must be preceded by notice and a hearing. Section 34-1012, O.C.L.A., warrants his concession. Order 116, which was preceded by notice and a hearing, is not challenged by the plaintiff. Order 117, issued August 3, 1948, was preceded, as we have already stated, by neither notice nor a hearing.

The hearing which preceded the entry of Order 116 continued from July 6 to July 10. Milk producers,

milk distributors and other persons interested in milk participated in the hearing. July 30 Order 116 was issued. Shortly thereafter the defendant commenced shipping milk from a plant which it operates in Portland to its St. Helens store where it retailed it. Until St. Helens was included in the Portland area, the defendant could not lawfully pursue that course.

Mr. Peterson, who, as director of the Department of Agriculture, issued Orders 116 and 117, swore that he did not intend to include any part of Columbia County in Order 116, and that when he found that had he done so he promulgated Order 117 to correct the purported error. As we have said, the defendant contends that the purported error was clerical and capable of correction without notice and a hearing.

■ We have quoted the part of § 34-1012, O.C.L.A., which confers upon the official charged with the administration of the Milk Control Act authority to "alter, revise or amend any order theretofore made with respect to * * * designating and defining the limits of markets * * *." The section adds: "* * * before making, revising and amending any such order, the administrator shall give notice * * *." Thus, Mr. Peterson, who, as Director of Agriculture [Oregon Laws 1943, Chap. 120], entered Orders 116 and 117, had express power to "alter, revise or amend" Order 116; but the issuance of a new order, if made pursuant to the express power just mentioned, had to be preceded, so § 34-1012, O.C.L.A., demanded, by notice and a hearing. The verbs "alter", "revise" and "amend" include within their meaning such action as one takes when correcting or rectifying an error. But, notwithstanding the fact that Mr. Peterson possessed express authority to make the needed correction—

assuming that an error lurked in Order 116—the defendant claims that Mr. Peterson was not required to employ the powers conferred by § 34-1012, O.C. L.A., when he made the alleged correction, but that he could avail himself of some implied powers which, the defendant says, Mr. Peterson possessed and which he could exercise without giving notice and without conducting a hearing. We shall now take notice of the purported implied powers.

Based upon the proposition that an order entered by an administrative agency is analogous to a judgment of a court, the defendant argues that agencies possess all of the powers to revise, alter and correct their orders that a court has over its judgments. He particularly claims that since a court can relieve judgments entered in its journals from clerical errors and misprisions, agencies may do the same with their orders.

To hold that any public official has powers in addition to those expressly conferred by statute is a serious matter. Such a holding amplifies and expands the powers of the official. Upon the expansion the official is invested, not only with the powers conferred by statute, but with other powers resulting from judicial accretion. Therefore, before considering the problem as to whether or not Mr. Peterson possessed the implied or inherent powers mentioned by the defendant, we will determine whether Order 116 contained a clerical error.

The defendant does not contend that after Mr. Peterson entered Order 116 he underwent a change of mind and decided to take out of the Portland marketing area the part of Columbia County which the order placed in it. He spurns all suggestions that

Order 117 was prompted by an afterthought. Both he and Mr. Peterson maintain that it never was intended that Order 116 should include any part of Columbia County, and that the words of the order which thrust the part of Columbia County into the Portland marketing area were the result of a clerical error undiscovered by Mr. Peterson when he signed the order. Therefore, the defendant seeks to sustain the validity of Order 117 upon the premise that an administrative agency possesses the same power to relieve its orders of clerical errors and misprisions which a court has over its judgments.

It is, of course, evident that the paper which a judge signs and which is entitled "judgment" is merely a record, memorial or evidence of the judgment. The actual judgment is the judge's personal pronouncement thereof, evidenced later by a document prepared by a clerk or other draftsman which seeks to state in formal phraseology for the court's enduring records the disposition of the case. If the original pronouncement of the judgment and the "judgment" as entered in the records coincide, no misprision occurred, and, accordingly, any attempt to make "a correction" is not an effort to correct a clerical mistake but to incorporate in the judgment a judicial change of mind.

We see from the foregoing that errors may creep into judgments from two sources: (1) the draftsman of the formal judgment entered in the court's journal or records may have failed correctly to reduce into writing the judicial pronouncement; (2) the judge himself may have made a mistake, as, for example, in computing the total of an award or in tracing the boundaries of a tract of land. Mistakes of the type first mentioned are termed misprisions and may be

corrected at any time. Mistakes of the latter type, resulting from a change of conviction, are judicial errors and can be corrected only in term time or some other very restricted period.

■ All of the foregoing was recently considered by this court in *Bogh v. Bogh*, 185 Or. 93, 20 P. 2d 503. The defendant's brief quotes extensively from that decision and expresses satisfaction with it. In a still later decision [*Harris v. Harris*, 192 Or. 361, 232 P. 2d 818], Mr. Justice Tooze stated succinctly the rule which underlay *Bogh v. Bogh*, in these words:

"* * * It is well established that during the term in which a judgment or decree is rendered, the court may amend or vacate the decree. But after the expiration of that term, except to correct clerical or formal errors, the court has no authority to amend, revise, modify or vacate a judgment or decree except by virtue of § 1-1007, O.C.L.A., unless it appears from the record of the case that the court was without jurisdiction to render the judgment or decree."

The question now presents itself, does the evidence indicate that Order 116 contained a clerical error.

The record shows that, due to recent growth of Portland, Mr. Peterson believed that the Portland marketing area should be enlarged. Accordingly, notice was given, and on July 6, 1948, the hearing commenced which eventually resulted in the issuance of Order 116. Before July 6, 1948, Mr. Peterson, Mr. Ohlsen and a third official of the milk control agency, whose name is Melvin J. Conklin, conferred at length concerning the boundaries which should be given to the area upon its expansion. Mr. Conklin is the field supervisor of the agency and had intimate knowledge

of the populous places near the borders of the Portland marketing area where it bounded other sales areas. He, also, was familiar with the streets, roads and natural objects, such as streams, which would make suitable borders for an expanded area. As the conference progressed, the three men came to an agreement concerning the localities and areas which they thought should be included in the expanded area. During the conference maps were used and conclusions were reached. After the three men had agreed, there was assigned to Mr. Conklin the task of reducing to writing in terms of metes and bounds the borders of the expanded area. The hour being late, Mr. Peterson and Mr. Ohlsen withdrew. Mr. Conklin, however, remained and, by availing himself of the help afforded by the phraseology of Order No. 40 and a large detailed map, wrote a description in longhand of the contemplated expanded Portland marketing area. We shall presently quote it. Upon completion of the task, Mr. Conklin placed the paper upon Mr. Ohlsen's desk and left his office. Whether or not Mr. Peterson saw the paper prior to the hearing which commenced on July 6 is not disclosed by the record. However, in the following answer he described, in part, the above conference:

"I don't recall the exact date, but preceding the actual drafting of the order. I might say there was a rough draft of most of the sections before it was put together. Mr. Ohlsen and Mr. Conklin and myself were in the office one afternoon until after 5 o'clock, going over the maps of the territory comprising the then Portland sales area and the territory adjacent, attempting to work out a legal description that would be definite and overcome the obstacles of the built up area that resulted in confusion, and we drew out the range section lines and the boundaries and laid them out, and I directed

at that time that the boundary be stipulated as those lines."

A few days later, when Order 116 was prepared, Mr. Conklin's description of the enlarged Portland marketing area was incorporated into the order without the change of a single word. We shall now determine whether or not Mr. Peterson was familiar with Mr. Conklin's paper and directed that the description contained in it should be incorporated in Order 116.

As we said, the record does not disclose whether or not Mr. Peterson, before the hearing, saw Mr. Conklin's paper, but it is clear that (1) before the hearing Mr. Ohlsen saw the paper; (2) at the hearing Mr. Peterson heard Mr. Ohlsen read the paper; and (3) during the course of the hearing Mr. Peterson showed familiarity with the description written by Mr. Conklin. It will be recalled that at that time Mr. Peterson was the Director of Agriculture and that Mr. Ohlsen was his subordinate entrusted with administration of the Milk Control Act.

According to a transcript of the evidence taken during the hearing over which Mr. Peterson presided, Mr. Ohlsen brought with him to the hearing Mr. Conklin's paper. Among those present was Mr. Samuel B. Weinstein, attorney for the Milk Control agency. While Mr. Ohlsen was giving testimony intended to show the necessity for expanding the marketing area, he was asked, according to the hearing transcript, several questions by Mr. Peterson, and then Mr. Weinstein asked him:

"Mr. Ohlsen, have you outlined the boundaries of an extended sales area if the facts indicate here

in the hearing that this boundary should be extended?"

The reply was in the affirmative. It is clear that the inquiry related to the paper written by Mr. Conklin. Thereupon Mr. Peterson said to Mr. Ohlsen:

"I would like to have you read what you propose as the Portland sales area as extended."

At that point Mr. Weinstein interjected this statement:

"I might say, are there any distributors or producer-distributors from the area around West Slope, around towards Beaverton in the audience?"

The transcript, taken at the hearing, shows that at that point Mr. Weinstein observed in the gathering some distributors whom he recognized, and said:

"I just want to call your attention that that might affect your present license provisions, and you might give close attention to it, and if you have got any comments to make this is the time to make them."

We mention the situation just indicated because it in itself directed attention to the description which Mr. Ohlsen presently read from Mr. Conklin's paper. At the close of Mr. Weinstein's remarks Mr. Ohlsen read Mr. Conklin's paper in its entirety. The following is what he read:

"The northern boundary of the Portland sales area, proposed, is the Oregon-Washington state line, Columbia River, starting on the west at a point two miles east of the range line dividing Ranges 2 and 3 west of the Willamette Meridian, and running in an easterly direction to a point one mile east of the range line dividing Ranges 4 and 5 east of the Willamette Meridian. The east boundary shall start at a point on the Oregon-Washington state line one mile east of the range line dividing Ranges 4 and 5 east of the Willamette Meridian

and run due north—or run due south, rather, to the Multnomah-Clackamas County line, thence west along the county line to the Rock Creek Road, then south along the Rock Creek road to the Sunnyside Road. The south boundary shall start at the intersection of the Rock Creek Road and Sunnyside Road and thence shall run west along Sunnyside Road to Mt. Scott Creek, North Fork of Kellogg Creek, thence west along Mt. Scott Creek, or Kellogg Creek, to the Willamette River, thence south along the west bank of the Willamette River to the intersection of the section line 4 miles south of the township line dividing Townships 1 and 2 South, thence west along said section line to the Tualatin River.

"The west boundary will start at the intersection of the Tualatin River and the section line 4 miles south of the township line dividing Townships 1 and 2 South and then run along the Tualatin River in a west and northerly direction to the third and northmost intersection with the section line two miles east of the range line dividing Ranges 2 and 3 west of the Willamette Meridian, then north along said section line to the place of beginning on the Oregon-Washington line and Columbia River."

That description was copied, word for word, into Order 116 which Mr. Peterson signed July 26, 1948. It is clear that Mr. Peterson heard Mr. Ohlsen read the description because at the close of the reading Mr. Peterson, addressing those who attended the hearing, gave an interpretation of the description. For instance, he said:

"Now, in simple language, that means that you will extend east to a point close to Crown Point and running south to the county line, and the south boundary about where it is now"

and continued on in similar vein until he was interrupted by one of those present, who inquired:

"I believe that western boundary line is approxi-

mately two miles or such a matter east of Hillsboro.''
to which inquiry Mr. Peterson replied, ''That's right.'' That answer was followed by a question asked by Mr. Weinstein, as follows:

''Takes in that new development, Mr. Ohlsen, West Slope and all that area in there?''

to which the reply was ''Yes.'' Presently Mr. Peterson stated the effect·which the new contemplated boundary would have upon present licensees. His portrayal resulted in colloquy among several of those in attendance and brought forth the question, ''Would that eastern boundary take in Gresham?'' and ''Does it take in Milwaukie?'' Mr. Peterson answered each of the questions.

We see from the transcript of the proceedings which occurred during the hearing that in the course of the latter Mr. Peterson heard Mr. Ohlsen read Mr. Conklin's proposed boundary of the enlarged Portland marketing area, that he manifested familiarity with the boundary and gave to those in attendance at the hearing interpretive comment.

We now resort to the testimony given by Mr. Peterson during the trial of this suit. During his examination, the description employed in Order 116 was called to his attention and he thereupon declared: ''That is the same proposed outline here in Mr. Ohlsen's statement at the hearing.'' Obviously, that statement conceded that the boundary delineation written by Mr. Conklin and read aloud by Mr. Ohlsen at the hearing was incorporated verbatim in Order 116.

After the foregoing testimony had been given, Mr. Weinstein asked Mr. Peterson:

''Mr. Peterson, in connection with the descrip-

tion of the area contained in the Order 116 and also contained in that portion of the transcript of that proceeding, which is now part of this proceeding and which counsel read to you as a comparison between the description of the area in the proceeding before July 6th to 9th and the description of the area in Order 116, did you check on any map at the time this was presented at the hearing to show where it extended?"

He answered:

"No, I didn't have a map before me at the time of the hearing."

Thus, it is seen that although Mr. Peterson heard Mr. Conklin's proposed description read at the hearing and answered questions about it, he claimed at the trial of this suit that, due to the absence of a map, he did not discover that the north boundary, as written by Mr. Conklin, included a part of Columbia County.

Mr. Conklin testified that, in preparing his aforementioned description of the expanded marketing area, he did not intend to include in it part of Columbia County, but intended to retain as the north boundary the line which separates Multnomah and Columbia Counties in the same manner as was done in Order 40, which he used as a drafting form. Continuing, he explained that he inadvertently omitted some words present in Order 40 and thus caused the north boundary of the proposed area to extend into Columbia County. It is claimed by the defendant that the purported error was not discovered until the day after Order 116 became effective.

The unchallenged testimony indicates that Mr. Peterson prepared the findings and that, after sending them to Mr. Weinstein, entrusted the latter with the

responsibility of phrasing the needed order, that is, Order 116. Mr. Peterson's own words were:

"Q. Did you give him instructions as to what was to be in that order?

"A. As to findings, yes.

"Q. But you never gave him instructions as to the sales area?

"A. I gave instructions to the Portland office as to the area and there was collaboration between them and Mr. Weinstein on any order."

It is manifest that when Mr. Peterson, after the close of the hearing, ruled that the Portland marketing area should be enlarged, he decided to employ as the boundary of the expanded area the border lines in terms of metes and bounds which Mr. Conklin had written before the hearing assembled and which Mr. Ohlsen read during the hearing. It is clear that after Mr. Peterson reached his conclusion, he sent Mr. Conklin's paper to Mr. Weinstein with instructions to him to incorporate Mr. Conklin's words into the new order which he instructed Mr. Weinstein to draft. In so doing he adopted Mr. Conklin's words as his own. It would have been no different had Mr. Peterson, taking pen in hand, copied Mr. Conklin's words upon a piece of paper of his own and then sent that paper to Mr. Weinstein. By adopting as his own Mr. Conklin's metes and bounds description, he made as his own, not only the merits of Mr. Conklin's description, but also its errors, if any. Mr. Weinstein was faithful to the instructions which Mr. Peterson gave him, and no one claims that he committed any error in drafting the order which Mr. Peterson shortly signed. The order was written in exact compliance with the instructions given by Mr. Peterson. It may be that Mr. Conklin had made the mistake which he avows, and that Mr.

Peterson had not intended to include part of Columbia County in the expanded Portland area. Nevertheless, Mr. Peterson had directed that the metes and bounds description entered upon the paper which he sent to Mr. Weinstein should be incorporated in the order. He never gave any other directions concerning the purported lines for the expanded area.

Since the defendant claims that the Milk Control agency possesses the same power to correct its orders as a court has to correct its judgments, we shall examine some decisions which distinguish between clerical and judicial errors.

In *Missouri Pacific Railway Co. v. Haynes*, 82 Tex. 448, 18 S.W. 605, the trial judge intended to award damages for the value of 87 bales of cotton which the defendant had negligently destroyed. The bales were manifested by three bills of lading, one for 51 bales, another for 30 bales and the third for six bales. As a matter of fact, the judgment awarded damages for only 81 bales and thus omitted damages for 3,011 pounds of cotton. The omitted amount was represented by the third bill of lading, that is, the one for six bales. The trial judge testified, according to the decision, that his error was committed in the following manner:

"* * * He intended to add up the weight of the 87 bales, and asked some one to call out the weights from the three bills of lading, and the person only called out the weight from two of them, omitting by oversight to include the six-bale lot. The judge thought he had included the weights of all the cotton, and testified that he found for plaintiff the weight of the entire 87 bales, and intended to give judgment for that amount, and thought he had done so, until the motion to correct the judgment was filed."

In holding that the trial judge, after the expiration of the permissible time, could not lawfully make the correction, the court said: "It was a judicial mistake."

In *Lankton v. Superior Court,* 5 Cal. 2d 694, 55 P. 2d 1170, the trial court, confronted with a motion to modify a judgment in the amount of $3,970 which it had previously entered, concluded that it had no authority to enter judgment in any amount in excess of $2,295. At that juncture the time for appeal and for moving for a new trial had expired. In granting prohibition to restrain the trial court from pursuing its contemplated course, the Supreme Court said:

> "The judgment in this case was the identical judgment which the trial court intended to render. There was no mistake in its entry, and it expressed in apt and definite terms the conclusion at which the trial court arrived during the trial of the action. If the court misconstrued the evidence before it, or misapplied the law applicable to the facts disclosed by the evidence, or was even misled by counsel, such an error was in no sense a clerical error which could thereafter be corrected by the court upon its own motion or in any proceeding except on motion for a new trial."

In *Karrick v. Wetmore,* 210 Mass. 578, 97 N.E. 92, the trial court, laboring under a misapprehension of the facts, dismissed the action which was the subject matter of the decision under review. Later, after term time and after discovery of the error, the court sustained a motion for vacation of the order of dismissal. The decision, written by Chief Justice Rugg, pointed out:

> "The facts as they now appear did not authorize the action of the court in June, 1899, in dismissing the case * * *. But such action was within the jurisdiction of the court."

In reversing the order which vacated the judgment of dismissal, the Chief Justice's opinion said:

"* * * But no clerical error appears here. There is no doubt that the docket memorandum of dismissal, minuted as the case was called, was made intentionally, although it might not have been made if the whole record respecting the case had been in the mind of the court. But that which was done was intended to be done, and the entry of judgment of dismissal in July, 1899, was the exact entry intended to be made. There was no clerical error."

In *State ex rel. Lundin v. Superior Court,* 90 Wash. 299, 155 P. 1041, it appeared that the trial judge, eleven months after sentencing one Paul Schuman to a term in the penitentiary of not less than six months and not more than five years, announced a purpose to modify his judgment, which had been regularly entered, so that the place of incarceration would be the reformatory and not the penitentiary. In an affidavit, the trial judge stated:

"Affiant further says: That, at the time of the imposition of said sentence, it was his intention, and that it was his judgment, that the proper sentence and the only sentence that should be imposed in said cause was a sentence of confinement of the said Paul Schuman in the state reformatory at Monroe, Wash., for a period of not less than six months nor more than five years. That it was the intention of your affiant to pronounce such sentence, * * * ."

The matter was before the Supreme Court of Washington upon prohibition sought by the prosecuting attorney and directed to the trial judge. In holding that "a trial court has no power to vacate or modify its final judgment after the announcement and the proper final entry thereof, in the absence of a showing

of some statutory ground for such vacation or modification," the decision described the contemplated modification as

> "an effort to modify a final judgment long after its rendition and proper entry by the clerk, upon the sole ground that the court intended to render a different judgment than that which it actually did render. * * * The unexpressed intention of the judge, and his memory thereof, cannot be invoked to change the judgment which he orally pronounced, and which was duly recorded as orally pronounced, as in this case."

We see from the foregoing that if the trial judge's pronouncement of his disposition of the case and the formal judgment as entered in the records match each other, any error which is later discovered cannot be termed a misprision. Any error which may exist between the two under such circumstances must be deemed a judicial error. By the pronouncement of a judgment we mean thoughts and conclusions which are uttered, and not unexpressed intentions of the kind which are described in *State ex rel. v. Superior Court,* supra.

The only conclusion which Mr. Peterson ever announced was to include in the Portland marketing area the part of Columbia County which is described in Order 116. He announced that purpose when, at the beginning of the hearing, he had Mr. Ohlsen read Mr. Conklin's paper. He manifested the purpose again when he promulgated Order 116 containing a verbatim copy of Mr. Conklin's description. Mr. Peterson never announced any other purpose. His wishes concerning the phraseology of his desired order were executed faultlessly.

■ Without further analysis, we express our conviction that no misprision lurks in Order 116. That being our belief, the situation calls for no expression of opinion as to whether or not the official who administers the Milk Control Act has implied or inherent power to correct his orders when he believes that a clerical error was committed in reducing to writing his pronouncements.

■ Assuming that an error of the judicial kind was actually committed in the promulgation of Order 116 and that, through its commission, the part of Columbia County described in that order was inadvertently included in the Portland marketing area, we think it is clear that resort would have to be had to the part of § 34-1012, O.C.L.A., quoted in a preceding paragraph, for the correction of the error.

The above disposes of all the contentions submitted to us. Although we have not mentioned in this opinion all of the authorities cited by the parties, all of them have received careful attention.

The decree of the Circuit Court is affirmed.